## Tunget v. Commonwealth.

December 17, 1946.

Rehearing denied Feb. 7, 1947.

Robert W. Zollinger for appellant.

Eldon S. Dummit, Attorney General, and J. L. Hughett, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE SILER—Affirming.

Earl Tunget was given a death sentence for murder. He now appeals from that judgment.

As grounds for reversal, Tunget contends that the following errors, each committed to the prejudice of his substantial rights, occurred on his trial, to wit: (A) handcuffs were kept on him; (B) the jury was permitted to separate; (C) he was not permitted to testify about the state of his own mental condition upon the occasion in controversy; (D) the judgment and verdict were rendered against him, even though all evidence proved he was insane at the time of this homicide.

Tunget, age 23, had, prior to his present implication, been committed to the Eddyville Penitentiary from

Jefferson County on April 14, 1945, under a life sentence for murder. After he had been in the penitentiary a little more than 8 months, the associate warden, L. R. Gumm, directed, on December 17, 1945, around 7 a. m., the captain of the guards to go with other guards to Tunget's cell to make a search for a pistol, then reported to have been in Tunget's possession. The captain of the guards and the three other guards with him opened Tunget's cell and ordered him to come out. He came out with his hands behind him, flashed a pistol on the four guards, who were armed only with canes or billets, forced all of them to enter his own cell, locked them inside, proceeded down the corridor with his pistol, encountered Gumm some distance from his cell, called on Gumm to surrender his club and to take him outside, then shot and killed Gumm on the latter's refusal to comply. Before he was overpowered and subdued, Tunget managed to shoot and slightly wound one of the other guards and to shoot through the coat of another.

A. Was it reversible error to keep appellant in handcuffs during the trial? As a general rule, we would condemn such a practice. A court would hardly be justified in permitting this to be done in one murder case out of an average hundred coming to trial. However, we have heretofore announced the rule to be that of permitting shackles on defendants during trials in *exceptional* cases, in cases where the trial courts appeared to have encountered some good grounds for believing such defendants might attempt to do violence or to escape during their trials. See the cases of Marion v. Commonwealth, 269 Ky. 729, 108 S. W. 2d 721; Blair v. Commonwealth, 171 Ky. 319, 188 S. W. 390. It appears to be the generally prevailing rule in many jurisdictions of this country that trial courts will be upheld in their exercise of thoroughly sound and reasonable discretion in the matter of keeping certain defendants in shackles during their trials. See 14 Am. Jur. 855. And now applying this rule of sound discretion, exercisable in exceptional cases, to our trial now under consideration, we perceive that Tunget was a man of demonstrated desperation. He had already been convicted of murder and had been given a life sentence. Before he had served a year of the time necessary to qualify him for a parole, he had procured a gun from the outside and in nerveless fash-

ion had herded four stalwart guards into his own cell. Thereafter, he had shot and killed the associate warden and had then shot at or through two other guards in pursuing his raging, reckless intent to escape, regardless of the resulting consequences. Confinement had not curbed him, courtroom solemnity had not cowed him, armed guards had neither daunted nor discouraged him. Therefore, this appears to have been an exceptional case and we are not prepared to say that the trial court abused sound discretion in keeping handcuffs on Tunget during the trial. If this was not an exceptional case, then we would hardly know how to recognize one: But again we say that ordinarily this practice should not be followed and usually it would be condemned by this court.

B. Should the jury have been permitted to separate during this trial? Our Kentucky Criminal Code of Practice, Sec. 244, provides that juries trying capital offenses, such as the one of the present case, must be kept together and in charge of an officer throughout the trial. But Subsection 2, Sec. 244, Ky. Criminal Code, reenacted in 1940, provides that such juries "may be permitted to separate by agreement of the attorney for the Commonwealth and the attorney for the defendant, with the approval of the trial judge, which shall be in open court and entered of record." We have held it to be a reversible error for the trial court to request the attorneys in the presence of the jury for an agreement for a separation of such jury during the trial of a capital offense. We consider such a request, made in the jury's hearing, as an instance of taking an unfair advantage of the defendant and his attorney. See the case of Anderson v. Commonwealth, 302 Ky. 275, 194 S. W. 2d 530. And now looking at the transpiration of events on this trial, we find in appellant's brief the admission that counsel for both sides "were called to the judge's bench and requested to agree to the separation of the jury." This clearly indicates that the separation request was not made in the hearing of the jury. Both the bill of exceptions of this case and the court order on the subject are consistent with the admission in appellant's brief to the effect that the separation request was made at the judge's bench, not in the hearing of the jury. Appellant's attorney made no objection to the proposed separation,

although he could very well have done so in confidential communication to the trial judge, when the subject was raised *at the bench*. Besides, there is neither a contention by the appellant nor even a slight indication by the record that any member of the jury was, during its separation, contacted by any one for the purpose of influencing the outcome of the trial. Since both the appellant's brief and the record indicate that the separation request was made outside the hearing of the jury, we are unable to say that there was a reversible error in this particular instance of jury separation, which seems to have been accomplished in general accord with code provisions and not in a prejudicial manner.

C. Should Tunget have been permitted to testify concerning his own mental condition, especially as it related to insane delusions and irresistible impulses, at the time of this offense? Now Tunget appears to have made the issue of this case, that is to say his defense, one of insanity. To support his theory of insanity, he introduced two well qualified doctors, one from Madison, Tennessee, and one from Louisville, Kentucky. They testified at length concerning Tunget's mental and physical condition and also concerning their expert conclusions as to his insanity. Tunget was asked, for the purpose of supporting the testimony of his doctors, the following question:

"Q. Tell the jury in your opinion how you have been treated and how you came to be in Eddyville?"

Objection to the foregoing question having been sustained, Tunget avowed that his answer to the question would have been: "That he had been falsely charged with murder and had not been given a fair trial; that he had used every effort that was legitimate in order to get out of the penitentiary but had been blocked at every turn by the unfairness of the Courts and that his lawyers had always sold him out; that he would never have been in Eddyville if he had been given a fair trial and had had the legal counsel that he wanted."

It will be observed that the question did not deal directly with the subject of insane delusions and that the answer, made by avowal, contained practically nothing except Tunget's own conclusions to the general effect that he had been "railroaded" into the penitentiary.

Probably more than half the inmates of penal institutions would readily answer a similar question in a similar manner. We do not believe the propounded question touched on the subject of insane delusions or on that of irresistible impulses. Nor do we believe that the avowed answer would have even tended to establish such delusions or such impulses on the part of Tunget, if the complete contents of such answer had been admitted and accepted at their full face value. In actuality, this record shows that Tunget was permitted to outline in great detail his own interpretation, as we have read it in other parts of his complete testimony, as to his treatment at the Eddyville penitentiary and as to his confinement therein. One of his answers, responding to interrogation of his counsel, is more than two pages in length and it sets out a rather complete, descriptive outline of the events of his sojourn at Eddyville, beginning with his arrival and initial shower bath and continuing on into the subjects of the prison's administration and the food provided for its inmates. That one lengthy answer of appellant furnished to the jury a much better index of Tunget's mental condition, whatever it may have been, than would have been furnished by the few brief conclusions of that avowed testimony, which was excluded by the trial court. It is an anciently established and well known legal principle that mere deductions, which have come from the existing facts themselves, are not admissible as evidence, the requirement being that the facts be produced and that the deductions or conclusions be left to the jury. See Townsend v. Commonwealth, 5 Ky. Opin. 785; Self v. Self, 1 Ky. Law Rep. 356; Coker v. Coker, 216 Ky. 669, 288 S. W. 291. And so we now hold that it was not error to exclude that particular part of appellant's testimony in the specific form in which it was offered. But if, on the other hand, this were a conceded error, we believe that the ultimate effect of such error was harmless, because the deficiency was corrected later when Tunget was permitted to testify at great length in his answers to other questions and to include in such answers the general subject matter of the testimony previously excluded.

D. Did all the evidence indicate that Tunget was insane? The transcript of this case has recorded the testimony of two doctors who testified for the Common-

wealth, each to the effect, in substance, that Tunget was sane. For example, we quote from the testimony given by Dr. A. M. Lyon, as follows: "He is not insane. I know he knows the difference between right and wrong now, and knew it at the time he committed this last crime."

But even if all the expert witnesses had testified for him, so that all the direct testimony on the subject had pointed to his insane condition, yet the jury would have been justified in finding him sane and therefore guilty, provided Tunget's own testimony was such as to indicate to the jury that he knew what his actions were and what he was doing at the time of the offense. See the case of White v. Commonwealth, 197 Ky. 79, 245 S. W. 892. And so, in reading the testimony of Tunget himself, we find that he narrated to the jury the full details of this tragedy, beginning with the unlocking of his cell door, continuing with his act of confining the four guards in his own cell, continuing further with his encounter with the associate warden in the corridor, continuing still further with his exact conversation with the associate warden just before the latter was killed by Tunget. As in the White case, supra, such testimony of Tunget himself would have constituted sufficient support for the verdict of the jury, which heard him testify as to the details of this crime and observed his demeanor on the witness stand.

Where one pleads a defense based upon insanity, the burden rests upon him to prove by a preponderance of the evidence that he was so unbalanced at the time of the crime that he did not then know right from wrong and was not then able to realize what he was doing or what consequences might result from his act. And if there was some evidence on the trial of such a person that tended to show that he knew what he was doing and knew that his intended act would be wrong, then his was a case for the jury's decision. Feree v. Commonwealth, 193 Ky. 347, 236 S. W. 246.

We think it was proper for the jury in the instant case to infer that Tunget was sane, that he knew what he was doing, that he knew it was wrong to kill the deceased Gumm. Tunget had carefully planned this entire stratagem. He had procured his weapon, had

previously divulged part of his plan to another prisoner, had coolly executed a part of his plan when forced to abandon the remainder of it because of the faultless fortitude of the associate warden. This was clearly a jury case. The verdict was not contrary to the evidence. We would be totally without any legal right in this case to undo the accomplished efforts of the jury.

As humanitarians, we would gladly give this young man another chance, although he has already had more than one chance. As a judicial body, we are concerned only with the fairness of his trial. We perceive that he had the benefit of skilled counsel, the opportunity to testify in his own behalf, the right of procurement of his own witnesses, the right to face his accusers at the trial, the right to select his own jury from among his peers, the opportunity to submit his theory of innocence to that jury for their decision. So far as we can ascertain, he has had his full day in court and he has also had a fair trial, possibly not entirely free from error, but substantially so and, as we believe, entirely so in the category of those errors known as prejudicial.

This young man has not been a good steward of that golden gift called life. This has brought tragedy home to himself, to his relatives, to the families of those he killed. It has brought a sense of sadness to those invested with the duty of enforcing retribution upon him. And so we now say, as courts customarily and very properly say in the face of duty's commanding necessity, "May God have mercy on his soul."

The judgment is affirmed.