**Kent HILL, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

**No. 2002–SC–0077–MR.**

Supreme Court of Kentucky.

Jan. 22, 2004.

Richard Hoffman, Assistant Public Advocate, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Perry T. Ryan, Assistant Attorney General, Frankfort, Counsel for Appellee.

Opinion of the Court by Justice COOPER.

A Muhlenberg Circuit Court jury convicted Appellant, Kent Hill, of engaging in organized crime, a class B felony, KRS 506.120(2), and his punishment for that conviction was fixed at ten years in prison. Because Appellant was also a persistent felony offender in the first degree, his sentence was enhanced by plea agreement to twenty years. KRS 532.080(6)(a). He appeals to this Court as a matter of right, Ky. Const. § 110(2)(b), asserting that: (1) he was denied his Sixth Amendment right to counsel because the trial court did not hold a *Faretta* hearing, *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), in response to his request to act as co-counsel for himself; (2) the evidence was insufficient to support his conviction; and (3) he was denied the presumption of innocence by being restrained in leg shackles during the course of the trial. The *Faretta* error requires that we reverse and remand for a new trial.

In 1990, Appellant was convicted on several charges arising from incidents in which he and other men, impersonating police, federal, and military officers, robbed suspected drug traffickers of their drugs, money, and valuables. For his involvement in these and other crimes, Appellant was sentenced to twenty-eight years imprisonment. He was subsequently incarcerated in the Green River Correctional Complex in Central City, Kentucky.

On June 1, 2001, while still in prison, a Muhlenberg County grand jury indicted him on charges of engaging in organized crime and being a persistent felony offender in the first degree. The indictment for engaging in organized crime charged that Appellant had organized or participated in organizing a criminal syndicate to smuggle marijuana into the Green River Correctional Complex for the purpose of trafficking in a controlled substance. Appellant pled not guilty and initially moved to proceed *pro se*. However, once counsel was appointed, Appellant requested only to serve as "co-counsel" so that he, rather than his attorney, could perform the direct and cross-examinations of some of the witnesses. The trial court granted Appellant's request, but without holding a hearing, providing any warnings, or making a finding that he was knowingly and intelligently exercising a limited waiver of his right to counsel. The court's only admonishment was that it would not allow both Appellant and his attorney to examine the same witness.

The trial lasted one day. The Commonwealth introduced five witnesses who testified that, along with Appellant, they collaborated to bring marijuana into the prison. Kelvin Ray testified that he met Appellant in 1999 shortly after being imprisoned at Green River and that the two entered into an agreement in the early summer of 2000 to smuggle marijuana into the prison for sale. Ray was romantically involved with one of the female correctional officers, Sharon Hightower, and Appellant had several female friends outside the prison who could obtain marijuana. Ray and Appellant agreed that Appellant's friends would deliver the marijuana to Hightower who would smuggle it into Green River and transfer it to Ray. Ray would keep half the marijuana and deliver the other half to Appellant. Hightower and Appellant's friends, Tracy Maggard and Linda Nicolais, all agreed to participate in the scheme. There was evidence at trial of three separate occasions on which marijuana was transferred from Maggard and/or Nicolais to Hightower who then smuggled it into Green River and delivered it to Ray. There was also evidence that Nicolais had delivered marijuana to someone other than Hightower for delivery to Appellant. The collaboration continued for two to five months until prison authorities discovered Hightower's activities. Ray, Hightower, Maggard, and Nicolais all testified against Appellant at trial. Another inmate, Mark Connolly, also testified that he had purchased marijuana from Appellant for resale within the prison and that Appellant told him that "he and Kelvin Ray had a female officer bringing it in."

Appellant presented testimony from five witnesses, including himself. He advanced the defense that he believed the substances delivered to him by Hightower, Maggard, and Nicolais were actually substances that he believed were legal, such as human growth hormone and a legal body-building supplement called "creatine." Appellant testified that if any marijuana was smuggled into the prison, Ray and Appellant's cellmate did it without Appellant's knowledge. Appellant recalled Nicolais for attempted impeachment. His three other witnesses were a prison official who conducted the investigation and two inmates who testified that they knew Ap-

pellant in prison and had never seen him with marijuana. They claimed that he was only in the business of selling items such as cigarettes and creatine. One of the inmates also claimed that he overheard Appellant's cellmate offering Ray $500.00 to "point the finger" at Appellant.

## I. RIGHT TO COUNSEL.

The right to counsel is protected by the Sixth Amendment to the United States Constitution and was firmly established in the seminal case, *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Section 11 of the Constitution of Kentucky independently recognizes the importance of counsel to assist the defendant in a criminal trial. We have held that "[t]he right to counsel is a fundamental constitutional right." *Jenkins v. Commonwealth,* Ky., 491 S.W.2d 636, 638 (1973).

■ Conversely, a defendant also has a state and federal constitutional right to proceed *without* a lawyer. In *Faretta v. California, supra,* the United States Supreme Court held that implicit in a defendant's Sixth Amendment right to make a defense is the right to *personally* do so, and proceed without counsel. *Id.* at 819, 95 S.Ct. at 2533. The Court therefore recognized that the right to the assistance of counsel expressed in *Gideon* is not a mandate:

> [I]t is one thing to hold that every defendant, rich or poor, has the right to the assistance of counsel, and quite another to say that a State may compel a defendant to accept a lawyer he does not want.

*Id.* at 833, 95 S.Ct. at 2540. Thus, *Faretta* held that "forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." *Id.* at 817, 95 S.Ct. at 2532 (quoting

Robert Jackson, *Full Faith and Credit— The Lawyer's Clause of the Constitution,* 45 Col.L.Rev. 1, 26 (1945)). The Constitution of Kentucky expressly guarantees this right. Ky. Const. § 11 ("In all criminal prosecutions the accused has the right to be heard by himself and counsel ..."); *Wake v. Barker,* Ky., 514 S.W.2d 692, 695 (1974).

Neither *Faretta* nor any subsequent opinion of the United States Supreme Court has specifically addressed whether a defendant has a Sixth Amendment right to make a limited waiver of counsel, as Appellant did here. However, dictum in *McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), notes that "*Faretta* does not require a trial judge to permit 'hybrid' representation of the type [the defendant] was actually allowed." *Id.* at 183, 104 S.Ct. at 953. Most lower courts, both state and federal, have followed this dictum, holding that the Sixth Amendment does not grant defendants the right to act as co-counsel, *i.e.,* the right to "hybrid representation." 3 Wayne R. LaFave, Jerold H. Israel & Nancy J. King, *Criminal Procedure* § 11.5(g) (2d ed. Supp.2003). Instead, the matter is generally left to the discretion of the trial court. *Id.; Locks v. Sumner,* 703 F.2d 403, 408 (9th Cir.1983).

■ However, because the Kentucky Constitution, unlike the United States Constitution explicitly guarantees a criminal defendant the right to be heard "by himself and counsel," Ky. Const. § 11, our predecessor court held in *Wake v. Barker, supra,* that "an accused may make a limited waiver of counsel, specifying the extent of services he desires, and he then is entitled to counsel whose duty will be confined to rendering the specified kind of services (within, of course, the normal scope of counsel services)." *Id.* at 696.[1] Thus, the

---

1. *Wake, supra,* also interpreted the Sixth

Amendment to the United States Constitution,

trial court here was constitutionally required to grant Appellant's request to serve as co-counsel for himself.

■ The federal and state right to waive counsel is accompanied by the right to be informed by the trial court of the dangers inherent in that decision. By waiving counsel, a defendant relinquishes many benefits, known and unknown. *Faretta, supra,* held that "in order to represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits." *Id.* (citations omitted). *See also Wake, supra,* at 695 (allowing a defendant who has made a *valid* waiver of counsel to proceed to trial unassisted). Thus, the trial judge has an affirmative duty to make the accused "aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with his eyes open." *Id.* (quoting *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942)). *See also Patterson v. Illinois,* 487 U.S. 285, 298, 108 S.Ct. 2389, 2398, 101 L.Ed.2d 261 (1988) ("[W]e have imposed the most rigorous restrictions on the information that must be conveyed to a defendant, and the procedures that must be observed, before permitting him to waive his right to counsel at trial."); *Wilson v. Commonwealth,* Ky., 836 S.W.2d 872, 882–83 (1992) (describing warnings

and proper questioning at length), *overruled on other grounds by St. Clair v. Roark,* Ky., 10 S.W.3d 482, 487 (1999). As such, the Commonwealth's contention that the issue is unpreserved is without merit. The duty to hold a *Faretta* hearing and make appropriate findings is an affirmative duty imposed upon the trial court, and there is no evidence here of express or implied waiver.

■ In Kentucky, a trial court's *Faretta* duties manifest themselves in three concrete ways. First, the trial court must hold a hearing in which the defendant testifies on the question of whether the waiver is voluntary, knowing, and intelligent.[2] *Cf. Jacobs v. Commonwealth,* Ky., 870 S.W.2d 412, 418 (1994) (interpreting *Faretta* and the Sixth Amendment to require a trial court to hold a hearing to determine if defendant knowingly and voluntarily elected to waive insanity defense). Second, during the hearing, the trial court must warn the defendant of the hazards arising from and the benefits relinquished by waiving counsel. *Wilson, supra,* at 882–83. Third, the trial court must make a finding on the record that the waiver is knowing, intelligent, and voluntary. *See Jacobs, supra,* at 418. A waiver of counsel is ineffective unless all three requirements are met.

■ The accused need not proceed completely *pro se* in order to trigger the

and the equal protection provisions of both the federal and state constitutions, as providing for the right to hybrid counsel. *Id.* at 696. We do not address here whether *Wake* was correctly decided in that respect. However, *Wake* was decided ten years before the United States Supreme Court rendered *McKaskle v. Wiggins, supra.*

2. Although *Faretta, supra,* referred to the waiver being merely "knowing and intelligent," *id.* at 835, 95 S.Ct. 2525 the additional finding that the waiver is "voluntary" is obviously necessary to protect the defen-

dant's constitutional rights. *E.g., Shafer v. Bowersox,* 329 F.3d 637, 651 (8th Cir.2003) (requiring that waiver be "knowing, voluntary, and intelligent"); *United States v. Manjarrez,* 306 F.3d 1175, 1181 (1st Cir.2002) (finding waiver to be "knowing, voluntary, and intelligent"); *United States v. Stubbs,* 281 F.3d 109, 118 (3d Cir.2002) ("A court should only accept a waiver after making a searching inquiry sufficient to satisfy the court that the defendant's waiver was understanding and voluntary." (Citations omitted.)).

trial court's *Faretta* duties. Rather, we held in *Jacobs, supra,* that those duties are triggered even by a waiver of a defense. *Id.* at 418. The defendant in *Jacobs* wished to waive an insanity defense against the advice of counsel, but was refused by the trial court. *Id.* We held that the defendant's exercise of this right on remand required that the trial court "hold a hearing as to [the defendant's] ability to voluntarily and intelligently understand and waive such defense, and such hearing shall be on the record . . . ." *Id.* Thus, even a limited waiver under the Sixth Amendment of the right to present a specific defense recommended by counsel triggers the trial court's duty to hold a hearing and make findings that the waiver is voluntarily and intelligently made.

▆ In the instant case, Appellant exercised his constitutional right, recognized in *Wake v. Barker, supra,* to make a limited waiver of his right to counsel. However, the trial court did not hold a hearing, give any *Faretta* warnings, or make a finding on the record that Appellant's waiver was knowing, intelligent, or voluntary. The Commonwealth contends that, unlike an absolute waiver of counsel as in *Faretta,* or even a waiver of a defense, as in *Jacobs, supra,* the trial court has no *Faretta* duties when there is only a limited waiver of counsel. We disagree.

In *United States v. Davis,* 269 F.3d 514 (5th Cir.2001), the United States Court of Appeals for the Fifth Circuit pointed out that, as with an absolute waiver of counsel, a defendant who makes a limited waiver of counsel forgoes "many of the traditional benefits associated with the right to counsel." *Id.* at 518. The defendant proceeds *pro se* with respect to those aspects of his defense that he undertakes on his own. *Id.* at 520. Therefore, " '[h]ybrid' or no, the representation sought by [the defendant] entailed a waiver of his Sixth

Amendment right to counsel that required the safeguards specified in *Faretta."* *Id.* Professors LaFave, Israel, and King concur, noting that "since hybrid representation is in part *pro se* representation, allowing it without a proper *Faretta* inquiry can create constitutional difficulties." LaFave, Israel & King, *supra,* at § 11.5(g). *See also United States v. Turnbull,* 888 F.2d 636, 638 (9th Cir.1989) (("If the defendant assumes any of the 'core functions' of the lawyer, however, the hybrid scheme is acceptable only if the defendant has voluntarily waived counsel.") (Citations omitted.)).

We find no authority to the contrary. The Commonwealth's reliance upon *United States v. Leggett,* 81 F.3d 220 (D.C.Cir. 1996), is misplaced. That case only held that the defendant had no right to *Faretta* warnings if he has not waived the right to counsel. *Id.* at 226. Unlike Appellant, the defendant in *Leggett* did not make a limited waiver of counsel; he merely posed supplemental questions to several witnesses after his counsel had finished examining those witnesses. *Id.* at 225–26. Thus, because "Leggett did not waive his right to the assistance of counsel and failed to invoke his right of self-representation," the trial court was relieved of the *Faretta* duties that otherwise would have attached. *Id.* at 226.

Here, Appellant unquestionably asserted his constitutional right to make a limited waiver of counsel under *Wake, supra:*

> Counsel: Mr. Hill has indicated to me that he does want to act as co-counsel.
>
> * * *
>
> Court: Now on this issue of co-counsel, Mr. Hill, I'm going to allow you to act as co-counsel, but the situation is this. You don't get to double team. You know, one witness comes on the stand, neither you—I mean both of you and [counsel] cannot question. One of you

can. When it comes time for argument, one of you can make one, but not both of you. You follow me?

Appellant: Yes. Basically, Your Honor, what I was trying to do is there is so many different aspects of prison life that [counsel] doesn't—I mean even with the time I've spent with him, he doesn't understand that, and when you speak to the witnesses, you have to realize where their frame of mind is at and what they're looking at, and I could bring out more from them because of what I know than what—I could sit and talk to him all day and he'd never have certain aspects of the—of the—of the entire case down like I do.

Court: In every case we try where there's more than one attorney representing a party, that is the same situation. Some attorneys have more experience in an area, but what those attorneys do, they decide who's going to do the questioning and cross-examination. Now, you're going to be allowed to be seated next to your attorney. You'll be allowed to write notes to him. You'll be given a pad. You can certainly converse with him as he's questioning people, but if you decide you're going to do the questioning of a witness, or the cross-examination of a witness, then [counsel] will not be doing it. You follow me?

Appellant: On that one witness you mean?

Court: As we go through every witness. Okay. Now, have we covered your motion in limine, [counsel]?

Counsel: Yes.

Appellant conducted the cross-examination of four of the five prosecution witnesses (Ray, Maggard, Nicolais, and Connolly) and the direct examination of two of the five defense witnesses (Nicolais and the

prison official). The record does not reflect whether Appellant received any assistance from counsel in preparing questions for these witnesses, but the transcript of evidence indicates that counsel remained silent during questioning by Appellant. Indeed, the Commonwealth made twenty-six objections to Appellant's questions during direct and cross-examination, and Appellant was required to respond to each objection without the assistance of counsel.

Appellant thus assumed the direct and cross-examinations of witnesses, a fundamental aspect of the assistance of counsel. *See Brown v. Commonwealth*, Ky., 934 S.W.2d 242, 247 (1996) (describing cross-examination as "the primary means by which trial counsel can attempt to persuade jurors of the weight or significance to be attached to the testimony of the witnesses" (quotation omitted)); 3 Fred Lane, *Goldstein Trial Techniques* § 11.01, at 6 (Callaghan 1999) ("It is principally through the direct examination of their witnesses, that parties truly present and emphasize their ... defense. Parties should not expect to win if they fail to do a good job ....."). Thus, the trial court erred by not holding a *Faretta* hearing, issuing warnings, and making a finding as to whether Appellant's waiver was knowing, intelligent, and voluntary.

We need not determine whether this error is harmless because it is "structural." The United States Supreme Court explained in *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), that unlike "trial errors," "which occur[ ] during the presentation of the case to the jury," and may be "quantitatively assessed in the context of other evidence presented in order to determine whether [the error] was harmless beyond a reasonable doubt," *id.* at 307–08, 111 S.Ct. at 1263–64, "structural errors" affect "the framework within which the trial proceeds

. . . ." *Id.* at 310, 111 S.Ct. at 1265. Thus, "structural defects in the constitution of the trial mechanism" require automatic reversal. *Id.* at 309, 111 S.Ct. at 1265. A prototypical example of a "structural error" is the denial of the right to proceed *pro se*, or a failure to adequately warn a defendant of the dangers of proceeding *pro se* under *Faretta, supra. See Jacobs, supra,* at 418 (reversing and remanding without conducting harmless error analysis). *See also Penson v. Ohio,* 488 U.S. 75, 88–89, 109 S.Ct. 346, 354, 102 L.Ed.2d 300 (1988) (harmless error analysis not applicable to violation of right to counsel when state appellate court granted appellate counsel's motion to withdraw and failed to appoint new counsel); *McKaskle v. Wiggins, supra,* at 177 n. 8, 104 S.Ct. at 950 n. 8 ("Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis. The right is either respected or denied; its deprivation cannot be harmless."); *Henderson v. Frank,* 155 F.3d 159, 170 (3d Cir.1998) ("deprivation of [defendant's] right to counsel at the suppression hearing is one of the 'structural defects in the constitution of the trial mechanism, which defy analysis by harmless-error standards." (Quotation omitted.)); *United States v. McKinley,* 58 F.3d 1475, 1480 (10th Cir.1995) ("When a court improperly denies the right to self-representation, that denial is not subject to harmless-error analysis."); *Savage v. Estelle,* 924 F.2d 1459, 1466 n. 14 (9th Cir.1991) ("harmless-error analysis is inapposite when the *Faretta* right is improperly denied."); *United States v. Allen,* 895 F.2d 1577, 1580 (10th Cir.1990) (overruling previous cases which applied harmless error analysis to invalid waiver of right to counsel); *Chapman v. United States,* 553 F.2d 886, 891 (5th Cir. 1977) ("[t]he nature of the right to defend pro se renders the traditional harmless error doctrine peculiarly inapposite."). Therefore, since the trial court held no hearing, issued no warnings, and made no finding that Appellant's limited waiver was knowing, intelligent, and voluntary, we are bound to reverse and remand this case for a new trial.

## II. SUFFICIENCY OF EVIDENCE.

Appellant asserts that he was entitled to a directed verdict of acquittal because the evidence against him was insufficient to support a conviction of engaging in organized crime. KRS 506.120 provides in relevant part:

(1) A person, with the purpose to establish or maintain a criminal syndicate or to facilitate any of its activities, shall not do any of the following:

 (a) Organize or participate in organizing a criminal syndicate or any of its activities;

 (b) Provide material aid to a criminal syndicate or any of its activities, whether such aid is in the form of money or other property, or credit;

 (c) Manage, supervise, or direct any of the activities of a criminal syndicate, at any level of responsibility;

 . . . .

(3) As used in this section "criminal syndicate" means five (5) or more persons collaborating to promote or engage in any of the following on a continuing basis:

 . . . .

 (e) Illegal trafficking in controlled substances as prohibited by KRS Chapter 218A . . . .

Appellant concedes that there was sufficient evidence to support the *mens rea* finding that he violated one or more of

provisions (1)(a)—(c), *supra,* and the finding that five or more persons were involved in the trafficking scheme. However, he contends that the evidence was insufficient to support findings that (1) the "collaboration" occurred "on a continuing basis;" and (2) that the syndicate was "collaborating to promote or engage" in "illegal trafficking in controlled substances." The Commonwealth responds that these objections are unpreserved and without merit.

### A. Preservation.

Appellant made a motion for a directed verdict of acquittal at the close of the Commonwealth's case-in-chief, and again at the close of all the evidence. The Commonwealth asserts that Appellant did not specify the grounds for such a motion. *Daniel v. Commonwealth,* Ky., 905 S.W.2d 76, 79 (1995). However, the transcript clearly shows that, at the close of the Commonwealth's evidence, the following colloquy occurred:

> Counsel: At this time, Your Honor, the defense would move for a directed verdict on the grounds of insufficient evidence.

> Court: Alright then. Of course this court has heard the evidence, the same as what the jury has heard and it's clearly evident that there's sufficient evidence to go to the jury on this charge of engaging in organized crime, so the motion of the defendant for directed verdict is denied and overruled.

(Emphasis added.) At the close of all the evidence, Appellant's counsel renewed his motion:

> Court: [W]e're here for purposes of motions.

> Counsel: We would just renew our motion for a directed verdict at this time.

> Court: Motion denied without further comment.

Appellant stated the grounds for his motion for a directed verdict of acquittal. He did not waive his right to appeal by not repeating his previously stated grounds upon renewing the same motion at the conclusion of all the evidence. If there was any possibility that the trial judge was confused about the grounds, or if Appellant was appealing on different grounds, the Commonwealth's argument would have merit. As this was not the case, we conclude that this issue was preserved for appeal.

### B. Continuing Basis.

Appellant argues that the evidence that the syndicate lasted five months at best is insufficient as a matter of law to establish that it operated "on a continuing basis," as required by KRS 506.120(3). We disagree.

> The standard of proof on this element of the crime is by its very nature indefinite. The Commonwealth is not held to proving any specific number of incidents or any element of time, but must show by the proof what the jury could infer from the evidence as intent to collaborate on a continuing basis.

*Commonwealth v. Phillips,* Ky., 655 S.W.2d 6, 9 (1983). Since *Phillips,* we have reaffirmed that no specific duration is required so long as the jury can find that the collaboration occurred on a continuing basis. *Edmonds v. Commonwealth,* Ky., 906 S.W.2d 343, 348 (1995) ("The prosecution is not required to prove any specific number of incidents or any element of time, but must show by proof what the jury could infer from the evidence as to intent to collaborate on a continuing basis."); *Dishman v. Commonwealth,* Ky., 906 S.W.2d 335, 342 (1995) ("The 'continuing basis' language in the criminal syndi-

cate statute has been held to be proper because the standard of proof on this element of the crime is by its very nature indefinite.").

 The facts here were sufficient to support a jury finding of a criminal syndicate operating on a "continuing basis." The witnesses generally agreed that the scheme lasted between two and five months. More importantly, much of the evidence supported the conclusion that the operation would have continued indefinitely if not discovered, as evidenced by Ray's direct testimony:

Q: [L]et me ask you this, the reason that it stopped is only because you got caught as opposed to people wanting to quit, right?

A: Yes. The officer was . . . .

Q: Caught?

A: Yeah.

Q: So this operation was continuing, but the reason it stopped is because Hightower got caught, based to what you know, is that right?

A: Yes.

Although Ray later suggested, in response to Appellant's cross-examination, that he planned to "get out" after smuggling a quarter pound of marijuana into the prison, the jury was free to believe his first statement. The syndicate was organized to smuggle marijuana into the prison for use and sale. The testimony of all of the other witnesses indicated that the operation would continue so long as it yielded Appellant the money he allegedly needed to pay his legal bills. Nor was there any suggestion that the appetite for marijuana in the Green River Correctional Complex would be satiated after being serviced by Appellant's syndicate for only a few months. The authorities at Green River were not required to wait and see if the syndicate lasted a year or more before ending the operation and bringing charges pursuant to KRS 506.120.

Appellant analogizes this case to cases interpreting the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 (RICO), which he interprets as requiring that the criminal activity last longer than the period established here. His interpretations are erroneous. The Supreme Court of the United States has held that RICO's continuity requirement is met when "the racketeering acts themselves include a specific *threat of repetition extending indefinitely into the future* . . . ." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 242, 109 S.Ct. 2893, 2902, 106 L.Ed.2d 195 (1989) (emphasis added). Because the authorities interrupt many syndicates in their early stages, "liability depends on whether the *threat* of continuity is demonstrated." *Id.* (emphasis in original).

The cases cited by Appellant in which the alleged criminal activity failed to meet the continuity requirement involved closed-ended schemes with no threat of continued operation. For example, *Manning v. Stigger*, 919 F.Supp. 249 (E.D.Ky. 1996), involved a solitary fraud that occurred over four months and came to a natural, voluntary, and planned end. *Id.* at 253. The court found that the fraud "threaten[ed] no future criminal conduct," and therefore was not continuous. *Id.* at 253–54. And, in *Johnston v. Wilbourn*, 760 F.Supp. 578 (S.D.Miss.1991), the court found no continuity when the defendants' conspiracy to commit fraud in order to merge two specific banks "was merely a short-lived scheme as to which there was no threat of repetition." *Id.* at 588. There is no inconsistency between these RICO cases and our interpretation of KRS

506.120.[3]

### C. Illegal Trafficking.

 Appellant asserts that there was insufficient evidence that the syndicate was "collaborating to promote or engage" in "illegal trafficking in controlled substances," as required to satisfy KRS 506.120(3)(e), because no marijuana was produced at trial and no witness was competent to testify that the alleged marijuana was, in fact, marijuana as opposed to, *e.g.*, oregano. In support of this argument, Appellant cites *Boyington v. State*, 748 So.2d 897 (Ala.Crim.App.1999), an Alabama case that apparently requires the government to actually confiscate the illegal drug in order to charge the defendant with its possession. *Id.* at 902–03. He further cites a host of cases from other jurisdictions and argues that they require the government to prove that the witnesses identifying the controlled substance, whether experts or laypersons, have some training or experience allowing them to make a proper identification. *See United States v. Spann*, 515 F.2d 579, 580 (10th Cir.1975); *State v. Scott*, 187 Ariz. 474, 930 P.2d 551, 554 (App.1996); *A.A. v. State*, 461 So.2d 165, 167 (Fla.Dist.Ct.App. 1984); *Dean v. State*, 406 So.2d 1162, 1164 (Fla.Dist.Ct.App.1981); *State v. McKee*, 91 Ohio St.3d 292, 744 N.E.2d 737, 741–42 (2001); *State v. Frazier*, 162 W.Va. 602, 252 S.E.2d 39, 50 (1979). Based on these cases, Appellant contends that no witness at his trial was shown to have such training or experience; *ergo*, a reasonable jury could not have concluded that the syndicate possessed marijuana, rather than, *e.g.*, oregano. Therefore, Appellant claims, that the evidence was insufficient to support a crucial element of the organized crime statute.

**3.** Of course, even if some RICO cases have been interpreted differently, this would have no definite impact on our interpretation of

However, in *Graves v. Commonwealth*, Ky., 17 S.W.3d 858, 862 (2000), we held:

> It is unnecessary for a conviction of trafficking in a controlled substance that the controlled substance be seized by the police or that it be introduced at trial. *Conviction can be premised on circumstantial evidence* of such nature that, based on the whole case, it would not be clearly unreasonable for a jury to find guilt beyond a reasonable doubt.

*Id.* at 862 (emphasis added). *See also United States v. Schrock*, 855 F.2d 327, 334 (6th Cir.1988) ("To our knowledge, no court has held that scientific identification of a substance is an absolute prerequisite to conviction for a drug-related offense, and we too are unwilling to announce such a rule. In view of the limitations that such a burden would place on prosecutors, and in accordance with general evidentiary principles, courts have held that the government may establish the identity of a drug through cumulative circumstantial evidence."). Here, abundant evidence, both direct and circumstantial, indicated that Appellant participated in organizing a criminal syndicate that illegally trafficked in marijuana. Ray, Nicolais, and Maggard, testified that Appellant collaborated with them to smuggle marijuana into the prison. Connolly testified that he purchased marijuana from Appellant while in prison. Ray testified that he tested the marijuana by smoking some of it himself. Hightower testified that Ray bribed her to bring marijuana into the prison. Thus, even if Appellant had been indicted for trafficking in marijuana, the evidence was sufficient to have convicted him of that offense. Of course, he was not indicted for trafficking in marijuana.

KRS 506.120, a separate and independent statute.

The Commonwealth was not required to prove that Appellant actually trafficked in marijuana to convict him of engaging in organized crime. Trafficking in a controlled substance is not an element of that offense. Collaborating to promote or engage in trafficking in a controlled substance is, *inter alia*, a part of the definition of a criminal syndicate. KRS 506.120(3)(e). Appellant was subject to conviction under KRS 506.120(1)(a) if he participated in organizing a criminal syndicate regardless of whether he subsequently collaborated with others by promoting or engaging in the syndicate's activities. Evidence of the latter is required simply to prove that the entity organized by Appellant was, in fact, a criminal syndicate. This case is more analogous to a criminal conspiracy case in which "the absence of an actual sale or seizure of narcotics does not render insufficient the proof of a conspiracy to distribute it." *United States v. Desimone*, 119 F.3d 217, 223 (2d Cir.1997).

### III. PRESUMPTION OF INNOCENCE.

■ Appellant's final ground for appeal is that the trial court's order to restrain him by leg shackles throughout the trial violated his constitutional right to be presumed innocent. He claims that this order was doubly prejudicial because he was acting as co-counsel. According to Appellant, his presumption of innocence could not survive this public manacling of both defendant and co-counsel.

It has long been the law in Kentucky that, in the absence of special circumstances, an accused should not be forced to face the jury in chains.

> It is a common-law right of a person being tried for the commission of a crime to be free from all manner of shackles or bonds, whether of hands or feet, when in court in the presence of the jury, unless in exceptional cases where there is evident danger of his escape or in order to protect others from an attack by the prisoner.

*Marion v. Commonwealth*, 269 Ky. 729, 108 S.W.2d 721, 723 (1937). This right relates closely to an accused's constitutional right to be presumed innocent until proven guilty. *See Young v. Commonwealth*, Ky., 50 S.W.3d 148, 171 (2001); *see generally Taylor v. Kentucky*, 436 U.S. 478, 483–86, 98 S.Ct. 1930, 1933–35, 56 L.Ed.2d 468 (1978) (outlining basis for treating presumption of innocence as a constitutional guarantee). Our predecessor court noted that shackles would be justified in less than "one murder case out of an average hundred coming to trial." *Tunget v. Commonwealth*, 303 Ky. 834, 198 S.W.2d 785, 786 (1946). The United States Supreme Court stated in *Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986), that shackling should "be permitted only where justified by an essential state interest specific to each trial." *Id.* at 568–69, 106 S.Ct. at 1346. We codified this common law right in RCr 8.28(5): "Except for good cause shown the judge shall not permit the defendant to be seen by the jury in shackles or other devices for physical restraint."

Both the historical common-law rule and RCr 8.28(5) underscore the serious prejudice that may result from manacling a defendant in the presence of the jury, but recognize the necessity for restraints in some circumstances. We balanced these interests most recently in *Commonwealth v. Conley*, Ky., 959 S.W.2d 77 (1997). In *Conley*, the defendant had previously escaped from the courthouse during his arraignment, and the trial court therefore ordered that he be shackled during the trial to prevent another escape. *Id.* at 78. To mitigate any resulting prejudice, the trial court issued admonitions and excused

two jurors for cause who indicated that the defendant's leg shackles would adversely impact their ability to presume his innocence. *Id.* We held that the prior escape gave the trial court a sufficient basis to regard the defendant as a man of "demonstrated desperation," and that the court did not abuse its discretion in ordering the restraints. *Id.*

Neither this Court nor the Supreme Court of the United States has ever considered whether, and in what circumstances, it may be appropriate to shackle a defendant who acts as his own counsel or co-counsel during his trial. Leg shackles obviously affect the ability to stand or move about when conducting cross-examination. A defendant in such a situation has the Hobson's choice of calling further attention to his restraints by attempting to move or, perhaps, reducing the effectiveness of his questions by taking cover behind the counsel table.

Nevertheless, the Missouri Supreme Court found no error in shackling a *pro se* defendant charged with a brutal murder who had previously escaped confinement. *State v. Armentrout,* 8 S.W.3d 99, 107–08 (Mo.1999). And, were we faced again with the defendant in *Tunget, supra,* who obtained a gun, forced four guards into his cell, killed the associate warden, and shot at two other guards, it would make little difference in the "good cause" determination that he was proceeding *pro se.* Thus, some, even if few, circumstances will arise where a trial court may, in its discretion, order that a defendant proceeding *pro se* or as co-counsel be shackled.

The decision presented to the trial court in the instant case was difficult, as demonstrated by the following colloquy among the trial judge, Appellant's custodial officer, the prosecutor, defense counsel, and Appellant:

Officer: That would probably be referring to the escape at Beaver Dam approximately five years ago. He escaped from two other correctional officers from the Kentucky State Penitentiary and was on the loose for several hours before the State Police—I'm not sure how many hours before the State Police recovered him, and I learned from the Internal Affairs that he had a zip gun in the back seat and he had a cuff key of some sort, a homemade cuff key to relieve himself from the restraints, and I also learned that there was a prior escape or attempted escape where his female partner may have passed him a cuff key and then there was a time between the Green River incident—or the Beaver Dam incident and this time that the penitentiary said that he was involved in an escape plot to go over the wall at the penitentiary.

Court: Now, the Beaver Dam incident you related to where there was an escape, was this a transportation to or from a courtroom?

Officer: He was either going to court or coming back from court. I think it was to court.

Court: Alright. What's the recommendation of the transportation officer with respect to what type of restraint? He is right now in chambers in what we call leg shackles and cuffs?

Officer: Right. I would prefer to keep leg restraints on if possible. I understand that he's versed in martial arts and I'm not sure what level he is, but

. . . .

Court: Alright. [Counsel], what's the position of the defendant?

Counsel: Your Honor, I think it would be extremely prejudicial to the jury to have him out there shackled in the

courtroom. I just object to that and I think that would be extremely prejudicial.

* * *

Appellant: As everything he said on my escape, my actual escape was true. I was in restraints when I escaped, Your Honor. Restraints—it wasn't—it was—they fired one of the officers. I wouldn't touch them. It was a non-violent escape. I refused to put my hands on them. I actually walked around the officer. Now all this is in the report where I—and they fired the officer because he did not physically restrain me. I've never had any violence on the record at all. My record speaks clear of that. Now, I know that first degree robbery is a violent offense, but if you read the specifics you'll see that we never actually pulled a gun on anybody. We had to carry guns because we were busting up a drug ring and they were violent people. But we never pulled—I had a gun pulled on me, Your Honor, and I took it away from him without hurting him. I don't have any history of violence in my—which he can verify. I've never had any history of violence in prison. I've never been in a fight in ten years, Your Honor, I've been in prison. Never had a fight. Never. I am not a violent person. I did escape one that one incident and I actually was a runaway. A runaway from the officers. I was under extreme distress. My son was being sexually molested. I mean I had to get to him, but that's five years past. I have no intentions of escaping. If I can beat this case which I'm hoping I can, I can get out this year. This coming year. And it would be foolish for me to even try to escape, Your Honor. That's—my record speaks for itself on my violent behavior or anything like that.

* * *

Pros.: Following the indictment of this defendant, the Internal Affairs intercepted a letter that he addressed to a Linda Nicolais, his girlfriend, trying to set up an escape, which would have included a feigning of an illness at the hospital and she was to go map out the area and to have someone with a firearm that could assist him in the escape, and they intercepted that letter and I provided counsel with a copy of that. So he has—even following—since the indictment participated in planning, trying to escape, which would include the use of a firearm.

Appellant: In rebuttal on that, Your Honor, I do have a copy of that letter and if you'll look at that letter and when I wrote that letter I was in "seg" under psychotropic medication. Okay. If you'll read the letter, you'll see where I mention going to Mexico and staying with Brent Yaird; who had been dead since August, Your Honor. I was out of my head. The doctor, the psychologist told them they had to get me off this medication because it was having a negative impact on my psychological condition.....

■ Thus, (1) Appellant had successfully escaped once, albeit five years prior to the trial; (2) Appellant had planned several escapes in the past; (3) Appellant had planned at least one escape since being indicted for engaging in organized crime at Green River; and (4) Appellant was somewhat skilled in martial arts (Nicolais subsequently testified that she first met Appellant when he was her karate instructor). Thus, the trial court could have reasonably concluded that Appellant

was an escape risk. The trial court articulated other facts relevant to the decision:

> Well, having considered everything that was stated into the record, and being really no contradiction in facts on the matter, and the court needing to note for the record that this is an old courthouse. We don't have a holding cell particularly for prisoners. We have rooms, but the rooms are shared by other witnesses with the defendant. We· have multiple doors in and out of the courtroom as well as this old courthouse. I have two bailiffs, who are deputy sheriffs, not particularly trained for the situation of having inmates from prison in and out of the courtroom. This courthouse and courtroom is accessible to all persons. In other words, the hallways utilized by the transportation officers and the defendant is also going to be accessible to jurors from time to time, persons from the outside, and given the number of prisoners that we're having here at this trial, I believe it's imperative, and I'm always reluctant to have any type of restraint at a trial on a defendant, but this case does absolutely require some restraints. So I'm not going to have him handcuffed, but I am going to have him in leg shackles .... I mean, just by virtue of this case, [the jury is] going to know he was an inmate already and I don't—any prejudice is going to be minimal and it's certainly outweighed by the necessity of some restraint based upon the defendant's record and recent activities.

Thus, the trial court weighed Appellant's history of escape and planned escapes, the porous nature of the courtroom and courthouse, and the fact that available security consisted only of two deputies poorly trained to prevent an escape, against the resulting prejudice partially mitigated by the fact that the jury would know from the facts of the trial that Appellant was incarcerated, and concluded that the security risk of not using restraints outweighed the prejudice flowing from their use. To further minimize the prejudice, the trial court gave the following admonition to the jury:

> Let me give you another admonition or an oral instruction and it is this. The Defendant is in leg restraints. That was pointed out by counsel in voir dire. You are not to hold that against him or to allow that fact to prejudice the Defendant in any way whatsoever in this case. He is restrained as a matter of policy and procedure by the Department of Corrections.

To maintain the presumption of innocence, an admonition of some kind is a virtual necessity when the accused is forced to appear before the jury in shackles. *Cf. Estep v. Commonwealth*, Ky., 663 S.W.2d 213, 216 (1983) (affirming when photograph of defendant handcuffed at time of arrest was admitted and jury was admonished that handcuffs had no significance); *Murray v. Commonwealth*, Ky., 474 S.W.2d 359, 361 (1971) (affirming when jurors were questioned and reported that seeing defendant in shackles and handcuffs would not affect their verdict).

Under the peculiar facts of this case, we are unable to conclude that the trial court abused its discretion in ordering Appellant restrained by leg shackles during his trial. The trial court's admonition and the fact that the jury already knew Appellant was a convicted criminal and a prisoner in a penitentiary mitigated the prejudice naturally attendant to such restraint. On remand, however, the trial judge may wish to reconsider whether any less restrictive or prejudicial means of preventing flight are available, such as a larger security force. The United States Supreme Court noted in *Holbrook v. Flynn, supra*, that a defendant is unlikely to suffer serious prejudice from a large security presence in the

courtroom; if the jury questions the security it might well assume that it is for the defendant's protection. *Id.* at 569, 106 S.Ct. at 1346; *see also Young v. Commonwealth,* Ky., 50 S.W.3d 148, 171 (2001); *Hodge v. Commonwealth,* Ky., 17 S.W.3d 824, 839–40 (2000).

Accordingly, we reverse the judgments of conviction and sentences imposed by the Muhlenberg Circuit Court and remand this case for a new trial.

JOHNSTONE, KELLER and STUMBO, JJ., concur.

WINTERSHEIMER, J., dissents by separate opinion, with LAMBERT, C.J., and GRAVES, J., joining that dissenting opinion.

Dissenting opinion by Justice WINTERSHEIMER.

I must respectfully dissent from the majority opinion because Hill has not demonstrated that his participation in the case as co-counsel prejudiced him in any way or influenced the verdict. Any possible error was entirely harmless. RCr 9.24.

The facts in this case show that Hill pled not guilty and initially sought to proceed pro se, however, once counsel was appointed for him, he requested only to serve as co-counsel so that he, rather than his attorney, could engage in direct and cross-examination of some of the witnesses. Hill told the trial judge that he wanted to act as co-counsel because he believed that his appointed counsel would not completely understand "prison life." The trial judge noted that Hill could communicate with his attorney and ask questions and seek advice during the one-day trial.

The requirement that the trial judge determine whether a criminal defendant's waiver of counsel is knowing and voluntary does not arise when the trial judge has appointed a defense counsel to act as co-counsel or standby counsel. *Cf. Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Moreover, there is overwhelming evidence against the defendant, and any conceivable error is harmless.

I would affirm the conviction in all respects.

LAMBERT, C.J., and GRAVES, J., join this dissent.