Newell STACY, Appellant

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2012–SC–000065–MR.

Supreme Court of Kentucky.

March 21, 2013.

Robert Chung–Hua Yang, Assistant Public Advocate, Appellate Division, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, Perry Thomas Ryan, Assistant Attorney General, Office of the Attorney, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice SCOTT.

A Boyle Circuit Court jury found Appellant, Newell Stacy, guilty of first-degree riot and of being a first-degree persistent felony offender (PFO). For these crimes, Appellant received a twenty-year prison sentence.

He now appeals as a matter of right, Ky. Const. § 110(2)(b), alleging that the trial court erroneously: (1) violated his due process rights by replaying witness testimony during the jury's deliberations in his absence, (2) violated his right to conflict-free counsel by permitting Department of Public Advocacy (DPA) Attorneys to engage in multiple representation of him and other defendants, (3) violated his speedy trial rights under KRS 500.110 and the Sixth Amendment to the United States Constitution, and (4) violated due process by permitting his witnesses to testify in shackles and prison garb.

For the reasons set out below, we affirm Appellant's convictions and twenty-year prison sentence.

## I. BACKGROUND

On August 21, 2009, a riot broke out in Northpoint Training Center, a prison facility in Burgin, Kentucky. That evening, Kentucky Department of Corrections Officer Tim Peavyhouse responded to a fire alarm in dormitory # 6 of the complex. As he began the process of evacuating the inmates from their dorm, the fire alarm in dormitory # 3 began to sound. When Peavyhouse went to dorm # 3, he noticed inmates had set fire to a trash can and several of them began throwing rocks at the responding officers.

Thereafter, inmates from dorm # 6 broke through a chain link fence and gained access to one of the prison's restricted areas. While attempting to quell the riot, Peavyhouse noticed that inmates from dormitory # 2 were also outside of their quarters.[1]

He also saw Appellant Newell Stacy attempting to break the locks off the multipurpose center's doors with a concrete gutter slab. Although Appellant was unsuccessful in gaining entry, he broke some

---

1. Peavyhouse was not certain whether the inmates had escaped from the dorm or had been evacuated by officers due to the fire alarms.

of the windows, lit toilet paper on fire, and threw it inside the building. He also set a trashcan on fire and threw it on top of the roof. According to additional witnesses, other inmates also participated in lighting the fires that eventually led to the complete destruction of the multipurpose building.

Appellant was thereafter indicted for first-degree arson, first-degree riot, and for being a first-degree PFO. Although the jury was unable to come to a unanimous determination as to the arson charge, it rendered a guilty verdict for the first-degree riot charge and found Appellant to be a first-degree PFO. The trial court subsequently adopted the jury's recommended sentence of five years for the first-degree riot conviction, enhanced to twenty years as a result of Appellant being a first-degree PFO.

Further facts will be developed as required.

## II. ANALYSIS

### A. Replaying of Witness Testimony

█ First, Appellant argues that the trial court unconstitutionally permitted the jury to hear recorded testimony from trial during its guilt phase deliberations. Specifically, Appellant asserts that the jury's viewing of the testimony outside of his presence violated due process. Appellant admits, however, that this issue is unpreserved, as no objection to the court's action was made. Thus, we review for palpable error under RCr 10.26.

█ We will reverse under the palpable error standard only when a "manifest injustice has resulted from the error." RCr 10.26. "[T]he required showing is [a] probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Martin v. Commonwealth*, 207 S.W.3d 1, 3

(Ky.2006). In this regard, there must be a " 'substantial possibility' that the result in the case would have been different without the error." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky.2006) *(citing Schoenbachler v. Commonwealth*, 95 S.W.3d 830, 836 (Ky.2003))*. Moreover, a palpable error "must involve prejudice more egregious than that occurring in reversible error[.]" *Ernst v. Commonwealth*, 160 S.W.3d 744, 758 (Ky.2005). When we engage in this degree of review, our "focus is on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Martin*, 207 S.W.3d at 5.

In this instance, after deliberations began, the jury asked if it could review Officer Peavyhouse's testimony. The trial court then permitted the jury to listen to the recorded testimony in the jury room without either party present. A few hours later, the jury asked if it could rehear the recorded testimony of the defense witnesses and the court again acquiesced. In neither instance was there an objection.

The United States Supreme Court has held that a defendant has a right to be present "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge ... [and it] is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Snyder v. Massachusetts*, 291 U.S. 97, 105–08, 54 S.Ct. 330, 78 L.Ed. 674 (1934), *overruled on other grounds by Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). Moreover, RCr 9.74 states in this regard that "[n]o information requested by the jury or any juror after the jury has retired for deliberation shall be given except in open court in the presence of the defendant ... and the entire jury, and in

the presence of or after reasonable notice to counsel for the parties."

■ Here, there is no denying that the trial court's replaying of the recorded testimony to the jury outside of the courtroom was error. We have definitively held that "[p]ursuant to RCr 9.74, the replaying of witness testimony is to be on the record in open court in the presence of the defendant." *McGuire v. Commonwealth*, 368 S.W.3d 100, 114 (Ky.2012) (*citing Mills v. Commonwealth*, 44 S.W.3d 366, 371–72 (Ky.2001)). However, the trial court did not commit palpable error, as Appellant has failed to establish that there is a "substantial possibility" that he would not have been convicted had he been present when the jury viewed the witness testimony. *See Brewer*, 206 S.W.3d at 349. Quite simply, he fails to show any prejudice arising out of the trial court's error. Thus, the error is not so fundamental that it would affect Appellant's entitlement to due process of law. *See also McGuire*, 368 S.W.3d at 115 (holding that the trial court's error in replaying witness testimony outside of the presence of the defendant did not infringe upon the defendant's due process rights and as a result, did not amount to a manifest injustice). Thus, we find no palpable error here.

### B. Conflict of Interest

■ Appellant also asserts that his Sixth Amendment right to effective assistance of counsel was violated because he was represented by counsel who had a conflict-of-interest. Specifically, Appellant argues that his counsels' joint representation of him and several others charged with crimes arising out of the Northpoint prison riot amounted to reversible error. Appellant further argues that the trial

court violated RCr 8.30 and that this violation is a reversible error as well.

According to Appellant, he was represented by several attorneys from the Department of Public Advocacy over the course of his defense.[2] At his arraignment, Appellant was represented by DPA Attorney Susanne McCollough. At a later status conference, he was represented by DPA Attorney Elizabeth Kidd. At a subsequent preliminary hearing, Appellant was represented by DPA Attorney Stacy Coontz. Several months later at his trial, Appellant asserts he was represented by McCollough, Kidd, and DPA Attorney Leslie Ayers. According to Appellant, these attorneys also represented several other defendants who were being tried for crimes arising out of their participation in the riot.

After review, we disagree with Appellant for two reasons. First, Appellant has failed to show that a cognizable Sixth Amendment violation exists because he was represented by other defendants' counsel. Second, Appellant has failed to show prejudice in order to establish a reversible RCr 8.30 violation.

### 1. Effective Assistance of Counsel

■ The Sixth Amendment provides that a criminal defendant shall have the right to the "Assistance of Counsel for his defence." U.S. Const. amend. VI. This right includes "the right to effective assistance of counsel," *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and effective assistance "includes the right to representation free from conflicts of interest." *Rubin v. Gee*, 292 F.3d 396, 401 (4th Cir.2002) (*citing Cuyler v. Sullivan*, 446 U.S. 335, 348–50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980);

---

**2.** Here, we accept Appellant's allegations of representation for the purposes of our analysis.

*Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981)).

██ Appellant's claim, is of course, an ineffective assistance of counsel claim. However, "[a]s a general rule, a claim of ineffective assistance of counsel will not be reviewed on direct appeal ... because there is usually no record or trial court ruling on which such a claim can be properly considered." *Humphrey v. Commonwealth,* 962 S.W.2d 870, 872 (Ky.1998) (*citing Caslin v. Commonwealth,* 491 S.W.2d 832 (Ky.1973)). "This is not to say, however, that a claim of ineffective assistance of counsel is precluded from review on direct appeal, provided there is a trial record, or an evidentiary hearing is held on motion for a new trial, and the trial court rules on the issue." [3] *Humphrey,* 962 S.W.2d at 872–73 *(citing Hopewell v. Commonwealth,* 641 S.W.2d 744 (Ky.1982); *Wilson v. Commonwealth,* 601 S.W.2d 280, 284 (Ky.1980)).

And here, we find that there is nothing present in the record which would "establish that an actual conflict of interest adversely affected [Appellant's] lawyer's performance." *Sullivan,* 446 U.S. at 350, 100 S.Ct. 1708. Appellant's bare assertion that a conflict did in fact exist because his lawyers represented other Northpoint defendants does not establish that counsel's performance was adversely affected. Contrary to Appellant's assertion, joint or multiple representation "is not *per se* violative of constitutional guarantees of effective assistance of counsel." *Holloway v. Arkansas,* 435 U.S. 475, 482, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). "[I]ndeed, in some cases, certain advantages might accrue from joint representation" such as "insuring against reciprocal recrimination." *Id.*

*(citing Glasser v. United States,* 315 U.S. 60, 62, 62 S.Ct. 457, 86 L.Ed. 680 (1942)).

In conclusion, Appellant has failed to show how his counsel was ineffective. Because Appellant cannot establish that a Sixth Amendment violation occurred, we find no error on this appeal.

### 2. RCr 8.30

██ In this same view, Appellant alleges that this joint or multiple representation violated RCr 8.30 and that this violation constitutes reversible error. RCr 8.30 states:

> If the crime of which the defendant is charged is punishable by a fine of more than $500, or by confinement, no attorney shall be permitted at any stage of the proceedings to act as counsel for the defendant while at the same time engaged as counsel for another person or persons accused of the same offense or of offenses arising out of the same incident or series of related incidents unless (a) the judge of the court in which the proceeding is being held explains to the defendant or defendants the possibility of a conflict of interests on the part of the attorney in that what may be or seem to be in the best interests of one client may not be in the best interests of another, and (b) each defendant in the proceeding executes and causes to be entered in the record a statement that the possibility of a conflict of interests on the part of the attorney has been explained to the defendant by the court and that the defendant nevertheless desires to be represented by the same attorney.

---

**3.** We note that at sentencing, Appellant asserted that his trial was unfair because his counsel labored under conflicts of interests by representing other defendants. In response, the court told him that he could assert an RCr 11.42 claim alleging that his counsel was ineffective at a later time.

Here, even assuming RCr 8.30 would be applicable[4] in the sense the multiple Northpoint prison defendants could be said to have been charged with "offenses arising out of ... [a] series of related incidents ...," Appellant's argument would still be without merit because he has not established that he suffered any prejudice as a result of the alleged violation. *Brewer v. Commonwealth*, 206 S.W.3d 313, 323 (Ky.2006) ("[F]ailure to comply with RCr 8.30 is harmless error when the record does not show even a possibility of prejudice resulting from joint representation of the accused.") (internal citation and quotation marks omitted). Appellant has simply failed to show how his counsel's performance was affected or how it might have influenced the jury's verdict and thus, we find no reversible error.

### C. Speedy Trial

Appellant makes two arguments asserting that his right to a speedy trial has been violated: (1) that his statutory right to a speedy trial under KRS 500.110 has been abridged, and (2) that his right to a speedy trial under the Sixth Amendment to the United States Constitution and Section Eleven of the Kentucky Constitution has been infringed upon. Again, we disagree.

#### *1. KRS 500.110*

 KRS 500.110 states:

Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of this state, and whenever during the continuance of the term of imprisonment there is pending in any jurisdiction of this state any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred and eighty (180) days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint; provided that for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.

KRS 500.110 "only applies when a defendant is incarcerated for one offense and a detainer has been lodged against him for another offense." *Gabow v. Commonwealth*, 34 S.W.3d 63, 69 (Ky.2000), *overruled on other grounds by Crawford v. Washington*, 541 U.S. 36, 60–61, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The purpose of the statute is "to expedite criminal proceedings against incarcerated individuals." *Spivey v. Jackson*, 602 S.W.2d 158, 159 (Ky.1980).

Here, we must make two determinations: (1) whether a detainer was lodged against Appellant, and (2) whether the trial court failed to bring Appellant to trial within 180 days after Appellant gave written notice of his request for a final disposition of the charges levied against him. As to the first determination, the record reflects that a detainer was lodged against Appellant on March 22, 2010. Thus, KRS 500.110 is applicable in this instance.

As to the second determination, we must establish when Appellant first gave written notice to the trial court. Appellant argues that he filed a pro se motion on May 2, 2011 asserting his speedy trial rights. However, the trial court, after reviewing the record and being unable to locate Ap-

---

4. Because of the failure to prove any prejudice due to the alleged violation, we do not address whether or not RCr 8.30 was, in fact, violated in this instance.

pellant's motion, found that there was no evidence that his motion was ever made. Specifically, the court determined that neither the Circuit Clerk, Commonwealth's Attorney, nor Appellant's attorney received a copy of Appellant's alleged motion. Further, prison records failed to establish that any correspondence was mailed by Appellant on May 2, 2011. As a result, the court held that Appellant first asserted his speedy trial rights on August 5, 2011; the date Appellant's counsel filed a motion for a speedy trial.

Having reviewed the record, we agree with the trial court that Appellant first submitted written notice asserting his right to a speedy trial on August 5, 2011. Appellant's trial began on November 28, 2011, which was within 180 days of when Appellant submitted his motion. Thus, the trial court did not violate KRS 500.110.[5]

## 2. Constitutional Right to a Speedy Trial

■ Appellant also asserts his constitutional right to a speedy trial was violated. The Sixth Amendment to the United States Constitution guarantees criminal defendants "the right to a speedy and public trial." [6] The right to a "speedy public trial" is also guaranteed by the Kentucky Constitution. Ky. Const. § 11. To determine whether Appellant's speedy trial rights have been violated, we balance four factors: (1) the length of delay, (2) the reasons for delay, (3) the defendant's assertion of his right to a speedy trial, and

(4) prejudice to the defendant. *Barker v. Wingo,* 407 U.S. 514, 530–32, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). "We regard none of the four factors ... as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Id.* at 533, 92 S.Ct. 2182.

### a. Length of Delay

■ We begin by asking whether the length of delay was presumptively prejudicial: "The length of delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors...." *Id.* at 530, 92 S.Ct. 2182. However, no precise time is presumptively prejudicial, as the length of delay must be considered within the particular context of each case. *McDonald v. Commonwealth,* 569 S.W.2d 134, 136 (Ky. 1978).

### (i) length

The length of delay is measured as "the time between the earlier of the arrest or the indictment and the time the trial begins." *Dunaway v. Commonwealth,* 60 S.W.3d 563, 569 (Ky.2001) *(citing Dillingham v. United States,* 423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975)). Because Appellant was already incarcerated, we measure the delay from the time of his indictment until his trial began. Appellant was

5. We also note that the Commonwealth and Appellant's counsel tendered a proposed agreed order on August 22, 2011, which requested that the trial court move Appellant's trial date from October 24, 2011 to November 28, 2011. This order was subsequently granted by the trial court. Had this agreed order not been entered postponing the trial, the original October 24, 2011 trial start date would have been within 180 days of Appellant's claimed pro se motion of May 2, 2011.

6. "This guarantee applies to the states through the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." *Smith v. Commonwealth,* 361 S.W.3d 908, 914 (Ky.2012) *(citing Barker v. Wingo,* 407 U.S. 514, 515, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *Klopfer v. North Carolina,* 386 U.S. 213, 222–23, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967)).

indicted on March 22, 2010 and his trial began on November 28, 2011. The length of delay, therefore, was twenty months and six days.

### (ii) context

Next, "we consider the particular context of the case in conjunction with the length of delay when determining presumptive prejudice." *Smith v. Commonwealth*, 361 S.W.3d 908, 914–15 (Ky.2012) *(citing McDonald*, 569 S.W.2d at 136–37). We do so because "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Dunaway*, 60 S.W.3d at 569 *(quoting Barker*, 407 U.S. at 531, 92 S.Ct. 2182). In *Dunaway*, we found three counts of robbery and one count persistent felony offender (PFO) to be "serious and of moderate complexity." The length of delay involved in that case was thirteen and one-half months. *Id.* We ultimately concluded that a case involving charges of serious and moderate complexity that was delayed for thirteen and one-half months was presumptively prejudicial. *Id.*

Here, we hold Appellant's charges for first-degree arson, first-degree riot, and first-degree PFO to be of a serious nature. We further hold these charges to be moderately complex. First-degree arson, first-degree riot, and first-degree PFO cannot surely be characterized as "ordinary street crimes" in this case, given the number of defendants involved, the crimes' unique setting (a prison), and the difficult discovery issues the trial court was charged to decide. However, we ultimately conclude that the charges are of moderate complexity, as Appellant's trial only lasted a few days.

As the charges were serious and of moderate complexity, we hold that the delay of twenty months and six days was presump-

tively prejudicial. *See also Bratcher v. Commonwealth*, 151 S.W.3d 332, 334 (Ky. 2004) (eighteen month delay in complex murder case was presumptively prejudicial). However, " '[p]resumptive prejudice' does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry." *Doggett v. United States*, 505 U.S. 647, 652, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992).

### b. Reasons for Delay

 When reviewing the reasons for the delay, we engage in a fact intensive analysis, as "any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case." *Barker*, 407 U.S. at 522, 92 S.Ct. 2182. Here, different weights should be assigned different reasons given for the delay:

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Miller v. Commonwealth*, 283 S.W.3d 690, 700 (Ky.2009). The purpose of our analysis is to establish "whether the government or the criminal defendant is more to blame for [the] delay." *Doggett*, 505 U.S. at 651, 112 S.Ct. 2686.

After review, we find that this factor weighs against Appellant for several reasons. From his arraignment until trial, Appellant insisted on being involved in the

defense of his case and desired to review the discovery that was turned over by the Commonwealth. At his first status conference on May 4, 2010, the court learned that Appellant was segregated in the Kentucky State Penitentiary (Eddyville) and as a result, did not have full access to the law library or the Commonwealth's discovery. We note that at this time, Appellant did not object to the trial court's decision to delay setting a trial date so that it could give Appellant time to review the discovery in his case.

Three months later, Appellant again informed the court that he was having issues reviewing discovery. As a result, the trial court ordered Appellant be transferred from Eddyville to Boyle County on at least five occasions so that he could gain access to the discovery and consult with his attorney. The last such trip from the Eddyville to Boyle County occurred on November 1, 2011—less than a month before Appellant's trial.

Simply put, Appellant would like to have his cake and eat it, too. While we regard Appellant's access to the discovery against him as vital to his right to participate in his own defense, we realize that, given the circumstances of this case, the trial court had to allot time for Appellant to review the discovery before his trial began. Here, we do not question the policies of the Kentucky State Penitentiary and defer to their judgment as to their decision not to grant Appellant—a segregated inmate—access to the materials due to safety concerns.

We also note Appellant agreed for his trial to be delayed for one month. The trial court originally scheduled his trial to begin on October 24, 2011. However (as discussed), Appellant entered into an agreed order with the Commonwealth to delay his trial until November 28, 2011. Thus, we find that Appellant's trial was delayed because delay is what Appellant desired.

We further recognize the abundance of pro se motions Appellant filed that had to be disposed of before trial. While simultaneously pursuing his motion for a speedy trial, Appellant filed two subsequent motions requesting additional discovery, a motion for access to the crime scene, and a motion for a *Faretta* hearing.[7] At the *Faretta* hearing, Appellant decided to withdraw this motion and retain appointed counsel. While Appellant is entitled to file these motions, the trial court must have sufficient time to dispose of them before trial.

Appellant suggests that the Department of Corrections's (DOC) protective order unreasonably delayed his trial. On October 25, 2010, Appellant moved the court for access to the DOC's Internal Report, which was composed as a result of the riot. The Internal Report was kept confidential by the DOC, but two documents that were based on the report—the Commissioner's Report and the report prepared by the DOC for the House Judiciary Committee ("the House Judiciary Committee Report")—were available to the public. Appellant sought to obtain the Internal

---

7. In this motion, Appellant originally sought to defend himself without counsel. "The right to counsel is so important that we require trial courts to first ascertain whether the relinquishment of the right in favor of the pro se right [to represent oneself] is knowingly, voluntarily, and intelligently made." *Swan v. Commonwealth*, 384 S.W.3d 77, 93 (Ky.2012) *(citing Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)). "This is done by having what has come to be known as a *Faretta* hearing,' at which the trial court is required to inform the defendant of the dangers and consequences of the decision." *Swan*, 384 S.W.3d at 93 *(citing Hill v. Commonwealth*, 125 S.W.3d 221, 226 (Ky.2004)).

Report and all documents used for its preparation. However, citing security concerns,[8] the DOC sought a protective order from the trial court forbidding the Internal Report's production.

On January 3, 2011, the trial court conducted a hearing to determine what Appellant would be permitted to discover. The court ultimately held that Appellant was entitled to the House Judiciary Committee Report and additional discovery from the Internal Report that related to the officers that intended to testify against the defendants involved in the riot. As a result of the trial court's ruling, the Commonwealth and defense attorneys worked together to uncover 1,500 pages of additional discovery that was produced a few months later.

Contrary to Appellant's assertion, we find nothing improper with the DOC's request for a protective order. There is nothing in the record that establishes the DOC's motion was made in bad faith or was meant to unreasonably delay Appellant's trial, as the DOC sought to protect the legitimate interests of its institutions.

Taking the above circumstances into account, this factor weighs against Appellant.

### c. Assertion of the Right

It is undeniable that Appellant asserted his right to a speedy trial, both orally and in written motions to the trial court. He first orally asserted his right at his arraignment on March 30, 2010 and again on July 5, 2011. Although he claims to have filed a pro se motion for a speedy trial on May 2, 2011, this motion was never received by the trial court. As discussed above, Appellant's counsel did file a motion for a speedy trial on August 5, 2011 and Appellant filed a subsequent pro se motion

requesting a speedy trial on November 18, 2011.

However, we again note that the trial court executed an agreed order tendered by the Commonwealth and Appellant's counsel on August 22, 2011 that moved Appellant's trial date from October 24, 2011 to November 28, 2011. Appellant's agreed order to delay his trial "cast[s] doubt on the sincerity of [his] demand" for a speedy trial. *U.S. v. Brown,* 169 F.3d 344, 350 (6th Cir.1999). Thus, although we do recognize that Appellant did in fact assert his right to a speedy trial, he did not vigorously do so. As a result, we cannot say that this factor weighs in Appellant's favor.

### d. Prejudice

The United States Supreme Court has identified three interests relevant to our prejudice inquiry that the Sixth Amendment's speedy trial right was designed to protect: (1) to prevent oppressive pretrial incarceration, (2) to minimize anxiety and concern of the accused; (3) and to limit the possibility that the defense will be impaired. *Barker,* 407 U.S. at 532, 92 S.Ct. 2182. Of the interests enumerated, "the last is the most serious." *Smith,* 361 S.W.3d at 908 (*citing Barker,* 407 U.S. at 532, 92 S.Ct. 2182). We now review these interests in correlation with the circumstances of Appellant's case.

### (i) Prevention of Oppressive Pretrial Incarceration

When a criminal defendant is incarcerated, he "is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense." *Barker,* 407 U.S. at 533, 92 S.Ct. 2182. Here, however, Appellant would have been incarcerated for oth-

---

8. Some safety concerns cited by the DOC were the potential publication of where weapons were stored, as well as where DOC personnel were to be stationed. during an emergency.

er crimes he committed even if he had not been awaiting trial on the charges arising out of the prison riot. Thus, this interest has not been impaired.

### (ii) Minimization of Appellant's Anxiety and Concern

By being incarcerated, an accused is "disadvantaged by . . . living under a cloud of anxiety, suspicion, and often hostility." *Barker*, 407 U.S. at 533, 92 S.Ct. 2182. However, general complaints about anxiety or concern are "insufficient to state a cognizable claim." *Smith*, 361 S.W.3d at 918 (internal citation omitted). Thus, "[w]e require an affirmative showing of unusual anxiety which extends beyond that which is inevitable in a criminal case." *Id.* (internal citation and quotation marks omitted). Appellant has failed to establish that he has suffered any unusual anxiety as a result of the pending charges before him. Therefore, this interest has not been infringed upon.

### (iii) Possibility of Impaired Defense

In his brief, Appellant states that he does not have to show prejudice to his defense as a result of the delay. We disagree. With respect to the third interest, we stated in *Bratcher* that "[c]onclusory claims about . . . the possibility of an impaired defense are not sufficient to show prejudice." 151 S.W.3d at 345; *see also Smith*, 361 S.W.3d at 919 ("Appellant must demonstrate actual prejudice."). Because Appellant has failed to show how his defense was impaired as a result of the delay, this interest has not been abridged.

In sum, Appellant suffered no prejudice arising out of his pretrial incarceration, as he was already imprisoned, for committing other crimes. Further, he has failed to make an affirmative showing that he suffered unusual anxiety as a result of the delay and has failed to establish that he suffered actual prejudice to his defense. Accordingly, we find that this factor does not weigh in Appellant's favor.

■ We conclude our Sixth Amendment analysis by finding that Appellant has not been deprived of his speedy trial rights. Although the length of the delay was presumptively prejudicial, we hold that Appellant was largely responsible for the delay and thus, the second *Barker* factor weighs against him. Further, we hold that although Appellant did in fact assert his right to a speedy trial, he failed to vigorously do so, and thus, the third factor weighs against him. Finally, we hold that Appellant suffered little prejudice as a result of the delay and as a result, the fourth factor weighs against him. Thus, we find no violation of Appellant's right to a speedy trial.

### D. Appellant's Witnesses in Shackles and Prison Garb

■ Appellant last asserts that the trial court committed palpable (unpreserved) error by denying him a fair trial. Specifically, Appellant argues that his fair trial rights were infringed when the trial court permitted four of his witnesses—all Northpoint inmates—to testify wearing shackles and prison garb. We use the word "permitted" because Appellant failed to make any pretrial motions concerning their appearance or to object to his witnesses' shackles and attire during their appearance at his trial.[9]

■ "Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that

9. Surprisingly, we note that the Commonwealth has failed to even respond to this argument in its brief.

'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.'" *Holbrook v. Flynn,* 475 U.S. 560, 567, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986) *(quoting Taylor v. Kentucky,* 436 U.S. 478, 485, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978)). Thus, under ordinary circumstances, "[w]hen defense counsel vigorously represents his client's interests and the trial judge assiduously works to impress jurors with the need to presume the defendant's innocence, we have trusted that a fair result can be obtained." *Holbrook,* 475 U.S. at 567–68, 106 S.Ct. 1340. However, "certain practices pose such a threat to the 'fairness of the factfinding process' that they must be subjected to 'close judicial scrutiny.'" *Id.* (citing *Estelle v. Williams,* 425 U.S. 501, 503–504, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976)). Thus, the right to a fair trial mandates that trial courts permit intrinsically prejudicial practices "only where justified by an essential state interest specific to each trial." *Holbrook,* 475 U.S. at 568–69, 106 S.Ct. 1340.

In this regard, the United States Supreme Court has found that a defendant's fair trial rights prohibit the defendant from being bound by physical restraints during trial "absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck v. Missouri,* 544 U.S. 622, 629, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005).[10] Similarly, the fair trial right prohibits the state from forcing a criminal defendant to appear in prison garb. *Estelle,* 425 U.S. at 505, 96 S.Ct. 1691.

However, the United States Supreme Court has not determined whether a defendant's right to a fair trial prohibits the defendant's incarcerated witnesses from wearing shackles or prison garb, nor have we. Other state courts that have considered the question are divided on the issue. *Compare White v. State,* 105 Nev. 121, 771 P.2d 152, 153 (1989) (holding that there is no constitutional right afforded to a defendant to have his witness appear in street clothes), *and State v. Marcelin,* 669 So.2d 497, 498 (La.Ct.App.1996) (holding that the defendant was not deprived of a fair trial when his witnesses testified in shackles and civilian attire), *with State v. Artwell,* 177 N.J. 526, 832 A.2d 295, 302–03 (2003) (holding that the defendant was deprived of a fair trial when one of his witnesses was required to wear shackles and prison garb).

The Nevada Supreme Court in *White* held that there was no constitutional right prohibiting a defendant's witness from appearing in prison clothes. 771 P.2d at 153. In its opinion, the court reasoned that the rule prohibiting a defendant from being tried in prison garb was based on the defendant's due process right to be presumed innocent until proven guilty. *Id.* Conversely, "[d]efense witnesses are not cloaked in the accused's presumption of innocence." *Id.* As a result, the court held that "there is no constitutional right accorded to a defendant to have his prison witness appear in civilian clothes." *Id.*

We agree with the Nevada Supreme Court that the "presumption of innocence" is not the standard applicable when a criminal defendant's incarcerated witness

---

**10.** *See also* RCr 8.28(5) ("During his or her appearance in court before a jury the defendant shall not be required to wear the distinctive clothing of a prisoner. Except for good cause shown the judge shall not permit the defendant to be seen by the jury in shackles or other devices for physical restraint.").

testifies. However, we are still required to determine whether the defendant's due process fair trial rights have been abridged. Thus, we begin by asking whether allowing a defendant's incarcerated witness to appear in shackles and prison garb is an intrinsically prejudicial practice and if so, whether sufficient state interests exist to justify its existence. *See Holbrook*, 475 U.S. at 568–69, 106 S.Ct. 1340 (holding that the trial court should permit intrinsically prejudicial practices "only where justified by an essential state interest specific to each trial.").

### 1. Intrinsically Prejudicial Practices

There are essentially two views as to whether shackling a defendant's incarcerated witness is intrinsically prejudicial. Some courts have held that the practice's prejudicial impact is minimal given the fact that the jury will undoubtedly discover during the course of the witness's examination that he or she is currently incarcerated. *See, e.g., People v. Arthur Ray Jones*, 10 Cal.App.3d 237, 245, 88 Cal.Rptr. 871 (1970) ("No prejudice resulted; the jurors were well aware that the crimes charged were committed in the jail, the testimony of the witnesses related to matters pertaining to conduct in jail, and their clothing could not alter this fact."); *Marcelin*, 669 So.2d at 498 ("Only sheer speculation supports the theory that this defendant was deprived of a fair trial because his witness, *whom the jury would legitimately learn was a convicted felon*, would lose his credibility because of his appearance in shackles.") (emphasis added).

Other courts, however, have disagreed, stating that the practice "undermines the credibility of the testimony that the witness offers on the defendant's behalf." *Artwell*, 832 A.2d at 301; *see also Harrell v. Israel*, 672 F.2d 632, 635 (7th Cir.1982) ("Although the shackling of defense wit-

nesses may be less prejudicial to the accused because it does not directly affect the presumption of innocence, it nevertheless may harm his defense by detracting from his witness' credibility."); *Commonwealth v. Brown*, 364 Mass. 471, 305 N.E.2d 830, 834 (1973) ("The shackling of a witness ... may influence a jury's judgment of credibility and further hurt the defendant in so far as the witness is conceived to be associated with him."); *State v. Hartzog*, 96 Wash.2d 383, 635 P.2d 694, 703 (1981) (en banc) ("While a shackled witness may not directly affect the [defendant's] presumption of innocence, it seems plain that there may be some inherent prejudice to [a] defendant, as the jury may doubt the witness' credibility.").

We hold to the view that the practice of forcing a defendant's incarcerated witness to be shackled can be inherently prejudicial. Thus, we agree with those jurisdictions that have held that the witness's appearance in restraints can undermine his or her credibility and thus prejudice the defense. We further hold, despite the lack of authority cited by either side, that the practice of forcing a criminal defendant's witness to appear in prison garb during his or her testimony can also be intrinsically prejudicial. A witness's appearance in prison garb—similar to his or her appearance in shackles—can lead to an insidious inference that the witness is untrustworthy and dangerous. Thus, we move on to the next step of our inquiry and ask whether, in each case, there are sufficient balancing state interests to justify each practice.

### 2. Sufficient State Interests

Although the practice of securing an incarcerated witness in restraints can be intrinsically prejudicial, it can also—in some instances—be justified by the state's interest in providing for the public's safety and that of the courtroom. Because there

is a risk that an incarcerated witness, while in the process of testifying, may resort to violence that could lead not only to harm to those present in the courtroom, but also to the public at large should the witness escape, shackles may be necessary, in certain circumstances, to restrain the witness so that the public is properly protected. Thus, each court faced with this prospect should evaluate the circumstances present and make findings supporting its decision.

As to the state interest justifying an incarcerated witness wearing prison garb, we believe this practice may also be justified, in some instances, by the state's interest in public safety; specifically, its interest in inhibiting or capturing an escaping witness. If escape should be perfected, law enforcement has a much better chance of capturing him or her in a timely manner if the witness is wearing prison garb as opposed to being dressed in street clothes. Thus, the state's interest in inhibiting an escape altogether, or in the capture after an escape, does justify, to some extent and under certain circumstances, the court requiring, or allowing, the witness to wear prison clothes.[11]

### 3. Our Holding

 Although we have found that requiring witnesses to wear shackles and prison garb can be an intrinsically prejudicial practice that could infringe on a crimi-

nal defendant's constitutional right to a fair trial, we have also found that the state's interest in providing for the public's safety may justify each practice under certain circumstances. Thus, the trial court, under most circumstances, should hold a hearing to determine whether the state's interest in public safety outweighs an inherent prejudice of either practice. From this hearing, findings supporting the trial court's decision should be made. Some factors the trial court may consider when balancing the public's safety in relation to the defendant's potential prejudice are the following:

> (1) the seriousness of the present charge, (2) the person's character, (3) the person's past record, (4) past escapes by the person, (5) attempted escapes by the person, (6) evidence the person is planning an escape, (7) threats of harm to others, (8) threats to cause disturbance, (9) evidence the person is bent upon self-destruction, (10) risk of mob violence, (11) risk of attempted revenge by victim's family, [and] (12) other offenders still at large....

*McMannis v. Mohn,* 163 W.Va. 129, 254 S.E.2d 805, 810 n. 7 (1979) (internal citation and quotation marks omitted). Although these considerations may be utilized, the trial judge may consider any other factor he deems relevant to public safety that may arise out of the given circumstances of a defendant's trial.[12]

---

11. We are reminded of the courthouse violence that occurred in Atlanta on March 11, 2005. *See CNN PRESENTS Encore Presentation Transcript: 26 Hours of Terror: The Untold Story of the Atlanta Courthouse Shootings,* http://transcripts.cnn.com/TRANSCRIPTS/ 0603/12/cp.01.html (last visited January 20, 2013). Brian Nichols arrived at the courthouse that day to appear on charges of rape. *Id.* Before his appearance, a deputy was assisting Nichols in changing from his prison garb to street clothes. *Id.* Nichols however, overcame the deputy, changed into the street clothes, and gained access to the courthouse,

where he brutally murdered the trial judge and court reporter and in escaping, murdered a courthouse deputy and a federal agent. *Id.* He was subsequently captured a day later in a hostage's home outside of Fulton County. *Id.* We can reasonably hypothesize that Nichols may have been captured earlier had he been wearing identifiable prison garb as he fled the courthouse.

12. For instance, some factors we deem relevant to public safety that we address in relation to Appellant's case (Section II.D.4) are the number of incarcerated witnesses that

#### 4. Appellant's Case

In this instance, Appellant filed no motions prior to trial to avert these circumstances, nor did he object to the appearance of his witnesses during the course of their testimony. Thus, his burden of establishing that his trial was unfair is much higher; he must show that any error was palpable (manifest injustice has resulted as a result of the alleged error). RCr 10.24. And here, the record sufficiently supports the trial court's actions, notwithstanding its lack of specific findings as discussed previously.

Thus, we find the prejudice suffered by Appellant from his witnesses wearing prison garb and shackles was minimal given the fact that the crime scene was Northpoint prison. Quite simply, the jury would have known during the course of the witnesses' testimony that they were incarcerated at the time of the event whether or not they were wearing shackles or prison garb.[13] Moreover, the fact that Appellant failed to object to either practice calls into question whether he even perceived the practices to be prejudicial under these circumstances.

As to the state's interest in public safety, we note that Appellant's failure to avert the circumstances or object has given this Court little opportunity to weigh the danger each witness may or may not have presented to the public's safety.

However, we hold this uncertainty, in this instance, weighs against Appellant. Further, we recognize multiple inmates testified on Appellant's behalf. The presence of multiple prison inmates in a public forum undoubtedly enhances the state's interest, and task, in successfully protecting the public's safety. In such a setting, the court normally takes special precautions.[14] Moreover, the scene of the crime (a prison), as well as the events leading to the charges at hand, illustrate the potential threat involved. As such, in this instance, considerations of public safety, especially on palpable error review, far outweigh any prejudice Appellant may have incurred due to his witnesses appearing in prison garb or shackles. As such, we hold on these specific circumstances that Appellant has suffered no manifest injustice and thus, we find no palpable error. In so holding, we cannot over emphasize that this trial concerned alleged prison crimes involving multiple inmate witnesses.

### III. CONCLUSION

For the foregoing reasons, we affirm Appellant's convictions and corresponding sentence.

MINTON, C.J., ABRAMSON, CUNNINGHAM, NOBLE, SCOTT, and VENTERS, JJ., sitting. MINTON, C.J., ABRAMSON, NOBLE, and VENTERS, JJ., concur. CUNNINGHAM, J., concurs in result by separate opinion.

---

will be testifying and that consequently, must be managed in and out of the courtroom, as well as the actual setting of Appellant's alleged crimes—Northpoint prison.

13. At first glance, our prejudice assessment seems to conflict with our earlier discussion in Section II.D.1. Above, we held that each practice can be intrinsically prejudicial despite the fact that the jury would eventually discover the witness was incarcerated. Here, however, we are not addressing whether prejudice exists in these circumstances, but are discussing the weight the intrinsic prejudice

should be given in balancing the state's interest justifying each practice.

14. For instance, more deputies must be utilized to transport and guard the witnesses to, in, and from the courtroom and back to the jail and multiple witnesses involve multiple trips. In fact, their mobility increases the complexity of this task. And as jurors often work on several cases during their jury terms, we surmise that increased courtroom security does not go unnoticed.

CUNNINGHAM, J., concurring in result.

I concur in the well-written opinion of Justice Scott except for one part. I take issue with the finding that the twenty-month delay was "presumptively prejudicial" in this case. When placed in its context, it was a very reasonable time to get the Appellant to trial. Neither is the prosecution of a prison riot of only "moderate complexity."

The trial of a prison riot prosecution is very complicated. There are a huge number of persons charged, with many witnesses pertaining to different defendants. The large number of defendants requires numerous trials for those who do not plead. It is impossible to try forty rioters at one time. That calls for numerous trials which eat up a lot of the calendar. Also, the Appellant was serving time on other charges and was not prejudiced by the delay. Therefore, I cannot agree that twenty months—less than two years—is presumptively prejudicial in this case. Therefore, I concur in result.