RENDERED: DECEMBER 19, 2019
TO BE PUBLISHED
FINAL
DATE 1/17/20

# Supreme Court of Kentucky

2017-SC-000293-MR

WILLIAM MCLEMORE                      APPELLANT

V.
ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE A. C. MCKAY CHAUVIN, JUDGE
NO. 15-CR-001328

COMMONWEALTH OF KENTUCKY          APPELLEE

**OPINION OF THE COURT BY JUSTICE WRIGHT**

**<u>AFFIRMING</u>**

Appellant, William McLemore appeals as a matter of right, Ky. Const. § 110(2)(b), from a judgment of the Jefferson Circuit Court convicting him of murder, first-degree assault, and first-degree wanton endangerment. He was sentenced to thirty-five years for these crimes. On appeal, McLemore argues the trial court erred in: (1) allowing the Commonwealth to present evidence that one of his co-defendants had been shot in the months leading up to the murder; (2) ruling that McLemore could not call a particular impeachment witness, as it found the witness had a Fifth Amendment right not to testify; and (3) denying McLemore's right to a speedy trial. For the following reasons, we affirm the trial court.

# I. BACKGROUND

On August 27, 2014, Destin "Blair" Lindsay was shot on Saint Louis Avenue. McLemore later told Sergeant Scott Beatty of the Louisville Metro Police that he had been "up the street" on Saint Louis at the time of the shooting. According to Michael Dunn, an acquaintance of Lindsay and McLemore, an ongoing "beef" between Saint Louis and Market Street led to Lindsay's shooting.

There are many varying accounts of the events which took place after Lindsay's shooting. Dunn said he met up with McLemore and three other men at the park on Saint Louis and the five men decided to retaliate for Lindsay's shooting. He said McLemore and two of the other men said they knew who had shot Lindsay. Dunn said they walked to 37th Street and approached a house and the other four opened fire. According to Dunn, he pulled the trigger on his own gun several times, but it did not fire.

Trey Anderson, one of the other men Dunn said he met up with in the park, provided a different version of events. According to Anderson, when he arrived at the Saint Louis Park after Lindsay had been shot, Dunn was already there. He said he did not see either McLemore or Demarkus Tramber (one of the other men identified by Dunn). Anderson said he drove down 37th Street with Dunn and Duwan Mason (another of the men identified by Dunn) and parked. A second car parked behind him. Anderson said he remained with the vehicles while the others got out. According to Anderson, he did not know the identity of the individuals in the other car. Dunn and Mason returned to

2

Anderson's car shortly after he heard gunshots. Anderson said he knew McLemore, but he did not name him as one of the individuals involved in the shooting.

According to Cierra Twyman, she was sitting on the porch with her boyfriend, the couple's daughter, Ne'Riah, and her boyfriend's brothers when she saw a group of men approach. She heard them talking to one another and then heard gunshots. Twyman was shot, as was her sixteen-month-old daughter, Ne'Riah. Ne'Riah did not survive the gunshot wound to the torso she sustained.

Damion Thompson, Twyman's cousin, testified he saw McLemore, Anderson, and a third man get out of a car on the corner of Market Street and 37th Street. He indicated that McLemore told him he was "ready to go handle something and shoot back out." Thompson heard gunshots around thirty seconds later. Thompson identified McLemore and Anderson by photograph and then later identified McLemore in court, though he said he did not personally know the two, but had seen them a few times in the past.

On September 6 Cedric Weaver was cited for trafficking. During his discussion with police, Weaver said he had seen the shooting that led to Ne'Riah Miller's death on August 27. He said that on the day of Ne'Riah's shooting, he had been sitting on a porch with Dujuan "Budda" Simonton. He said he saw a group of people walk down Market Street and ask people if they were "from Market." When someone responded in the affirmative, the men pulled out their guns and started shooting. According to Weaver, he saw both

3

McLemore and Tramber shooting at people "a couple houses down from Na'Rhiah's home". Weaver claimed Simonton was in the house when the shots were fired.

Simonton would later deny any recollection of where he was on the day of the shooting, and deny seeing Weaver on that day.

On September 11, 2014, McLemore was jointly indicted with Tramber for one count of murder, one count of first-degree assault, ten counts of attempted murder, and nine counts of first-degree wanton endangerment. Both McLemore and Tramber were then jointly re-indicted for the same offenses along with Anderson, Dunn, and Mason in a superseding indictment.

Anderson and Dunn both entered plea agreements with the Commonwealth that required them to "testify truthfully in any proceeding related to his co-defendants." McLemore, Mason, and Tramber all proceeded to trial and all three were convicted of murder, first-degree assault, and four counts of first-degree wanton endangerment. Tramber waived his right to directly appeal and was sentenced separately. McLemore and Mason were each sentenced to thirty-five years' imprisonment. This case involves McLemore's appeal from those convictions.

## II. ANALYSIS

### A. Tramber's shooting

McClemore first asserts that the trial court erred in allowing the admission of evidence that Tramber, one of his co-defendants, had been shot three months prior to the date of the shooting herein. He argues that the

4

evidence was not relevant; or, in the alternative, that its probative value was outweighed by its undue prejudice.

We begin our analysis of this issue by examining this Court's evidentiary rules. Kentucky Rules of Evidence (KRE) 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Further, KRE 402 provides that

> All relevant evidence is admissible, except as otherwise provided by the Constitutions of the United States and the Commonwealth of Kentucky, by Acts of the General Assembly of the Commonwealth of Kentucky, by these rules, or by other rules adopted by the Supreme Court of Kentucky. Evidence which is not relevant is not admissible.

Finally, KRE 403 deals with the exclusion of relevant evidence, and reads, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

The bar for evidence to meet to be considered relevant is low. *Blair v. Commonwealth,* 144 S.W.3d 801, 808 (Ky. 2004) ("To show that evidence is relevant, only a slight increase in probability must be shown."). Therefore, McLemore's argument that the trial court erred in admitting evidence that Tramber had been shot is based on his assertion that the evidence fails the KRE 403 balancing test. He insists the probative value of the evidence was substantially outweighed by the danger of undue prejudice.

5

We have held:

> A proper balancing under KRE 403 requires that a trial court consider three factors: the probative worth of the evidence, the probability that the evidence will cause undue prejudice, and whether the harmful effects substantially outweigh the probative worth. *Barnett v. Commonwealth*, 979 S.W.2d 98, 100 (Ky.1998). Thus, if the possibility of undue prejudice outweighs the probative worth of the evidence presented, it should be excluded.

*Yates v. Commonwealth*, 430 S.W.3d 883, 897 (Ky. 2014). Furthermore:

> What is contemplated as "unfairly" or "unduly" prejudicial is evidence that is harmful beyond its natural probative force: "Evidence is unfairly prejudicial only if . . . it 'appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish,' or otherwise 'may cause a jury to base its decision on something other than the established propositions in the case.'"

Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 2.10[4][b] (4th ed. 2003) (internal citations omitted).

On appellate review, we will not overturn a trial court's evidentiary rulings absent an abuse of discretion. *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). Further, "in reviewing the trial judge's balancing under KRE 403, the appellate court must view the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *Major v. Commonwealth*, 177 S.W.3d 700, 707 (Ky. 2005).

6

In line with this precedent, we examine the probative value of the evidence taken in a light most favorable to the Commonwealth. "The 'probative value' or 'probative worth' of evidence is a measure of how much the evidence tends to make the fact it is introduced to prove more or less probable." *Hall v. Commonwealth*, 468 S.W.3d 814, 823 (Ky. 2015). The evidence in question concerned the shooting of Tramber (one of McLemore's co-defendants) three months prior to the shooting in the present case. In admitting the evidence, the trial court found that "the res gestae of this particular case may stretch back to [Tramber's shooting] because that's where the . . . bad blood if you believe the Commonwealth's version of events may have first . . . gone bad and the roots of whatever happened [in this case] . . .can be traced back to" Tramber's shooting. The trial court also indicated that "[i]t also goes to motive. . . . It's highly probative for sure."

The Commonwealth sought to prove that the motive for McLemore and his co-defendants to perpetrate the charged crimes was to get revenge for another shooting that happened that day—and that the two shootings on August 27 were not an isolated incident. The Commonwealth called Louisville Metro Police Detective Chad Johnson to the stand. Johnson testified that he had investigated Tramber's shooting on May 29. Tramber told Johnson that the shooters were "a group of black males" he believed to be from Market Street. The Commonwealth's case centered on its belief that the shootings were related to bad blood between the St. Louis and Market Street

7

neighborhoods. The trial court found that Tramber's shooting in May provided evidence of res gestae and motive.

We have held "where evidence is needed to provide a full presentation of the offense, or to complete the story of the crime . . . there is no reason to fragment the event by suppressing parts of the *res gestae.*" *Webb v. Commonwealth,* 387 S.W.3d 319, 326 (Ky. 2012) (internal citation omitted). Further, we have stated that the Kentucky Rules of Evidence are "intended to be flexible enough to permit the prosecution to present a complete, un-fragmented, un-artificial picture of the crime committed by the defendant, including necessary context, background and perspective." *Major,* 177 S.W.3d at 708. Because "proof of motive and opportunity is certainly probative enough for admission under KRE 403," *Gray v. Commonwealth,* 480 S.W.3d 253, 267 (Ky. 2016), we will not disturb the trial court's ruling that Tramber's shooting amounted to probative evidence in this case. That court did not abuse its discretion in so finding.

McLemore insists that the Commonwealth failed to produce any evidence from either of McLemore's testifying co-defendants that Tramber's shooting served as a motive in this case. However, Dunn testified regarding the ongoing problems between the neighborhoods, stating that he supposed "whatever ongoing beef there was led to" the shooting of Destin Lindsay, and then the retaliatory shooting that led to Ne'Riah Miller's death a few hours later.

McLemore's statement to police even alluded to an ongoing conflict between Market and Saint Louis. In the statement he indicated that the

8

trouble with Market Street went back to "when Marcus got shot a while ago." It is unclear whether "Marcus" refers to Demarkus Tramber or another individual. But, either way McLemore himself referred to an ongoing issue between the neighborhoods.

McLemore insists that, even if otherwise probative, the Tramber shooting three months earlier was too remote in time to be admissible in this case. McLemore directs us to *Robey v. Commonwealth*, 943 S.W.2d 616, 618 (Ky. 1997), where this Court held, "[t]he requirement that the prior act be 'not too remote' is integral to determining the probative value of the evidence. Thus, an independent act too remote in time will fail the balancing test required by KRE 403." He insists that Tramber's shooting three months earlier was too remote in time. However, *Robey* is easily distinguishable from the case at bar. In that case, we went on to state, "[t]he prosecution is not privileged to show unconnected and isolated unlawful conduct that had no bearing upon the crime under scrutiny. The evidence of a single sixteen-year-old conviction, although the crimes had similar aspects, was simply too remote." *Id.* Here, the Commonwealth asserted that the shootings were not the type of "unconnected and isolated" events at issue in *Robey*. Rather, according to the Commonwealth, one acted as motive for the next. We hold the two shootings were not "too remote" for consideration herein.

Having held that the evidence of Tramber's shooting was probative, we move on to determine "the probability that the evidence will cause undue prejudice." *Barnett v. Commonwealth*, 979 S.W.2d 98, 103 (Ky. 1998). Here,

9

there was no assertion that McLemore was involved in Tramber's shooting in any way. Rather, the evidence was admitted in support of the Commonwealth's theory that the St. Louis and Market Street neighborhoods had an ongoing conflict and that Tramber's shooting was part of the conflict that provided motive for the shooting that ended Na'Rhiah Miller's life. McLemore asserts this evidence sought to have the jury convict him for what he "was" rather than what he "did on the occasion of the charged offense."

Specifically, McLemore insists that the Commonwealth used this evidence to paint McLemore as the type of person who engages in vigilante justice in retribution for wrongs against his friends. McLemore points to the Commonwealth's statement during closing that "all of this back-and-forth between Saint Louis and Market, between the . . . shooting of Demarkus Tramber in May, . . .the shooting of Destin Lindsay . . . there are some groups of people that the way that they solve their problems is this shooting back and forth." He asserts that this made the evidence unduly prejudicial.

While McLemore disagrees with the manner in which the Commonwealth argued its case and its theory of motive, it is unclear to this Court how the fact that Tramber was shot in the past prejudiced McLemore in any way. Evidence of an ongoing beef between the neighborhoods came in—some even through McLemore's own statement. Evidence of the fact that Tramber was shot does not prejudice McLemore—unduly or otherwise. No evidence was presented that McLemore was involved in the Tramber's shooting—just that the shooting

10

played a role in his and his co-defendants' motive for the shooting that killed Na'Rhiah Miller.

Viewing "the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value," *Major*, 177 S.W.3d at 707, we hold the trial court did not abuse its discretion in allowing the admission of evidence that Tramber had previously been shot.

## B. Impeachment Witness

McLemore next argues that the trial court erred in ruling that he could not call an impeachment witness. Specifically, the trial court ruled that Dujuan "Budda" Simonton had a Fifth Amendment right not to testify after Simonton's attorney invoked the Fifth Amendment privilege on his client's behalf.

McLemore's trial counsel stated that he wanted to impeach Cedric Weaver's testimony with that of Simonton. Weaver had testified that the day of the shooting, he had been on Simonton's aunt's porch with Simonton, but that "Budda . . . was not on the porch" at the time of the shooting. Weaver said that Simonton had gone inside the house before the shooting. McLemore sought to impeach Weaver's statement as to Simonton's location at the time of the shooting. McLemore's counsel wanted to ask Simonton whether he was "on the porch on 37th Street that day" and if he was "with Mr. Weaver."

The trial court stated:

I think he does have a Fifth Amendment right based on my understanding of what the . . . tenor of the questions and the

11

subject matter of the questions . . . and just like he can tell a police officer "I choose not to speak to you," . . . I think he can tell counsel in this case that he chooses not to participate. So, I'm gonna . . . find that he's . . . unavailable as a witness in this case.

Simonton was never called to the stand, but the trial court ruled that Simonton's attorney invoked his Fifth Amendment right for him. Whether a prospective witness has invoked his Fifth Amendment privilege against self-incrimination is a question of fact to be determined by the trial court. We do not disturb a trial court's factual findings absent clear error. *Welch v. Commonwealth*, 149 S.W.3d 407, 409 (Ky. 2004). "Under this standard, the trial court's findings of fact will be conclusive if they are supported by substantial evidence." *Smith v. Commonwealth*, 410 S.W.3d 160, 164 (Ky. 2013).

McLemore insists that the trial court's alleged error in preventing him from calling Simonton as a witness deprived him of his right to Due Process pursuant to the Fourteen Amendment and his Sixth Amendment right to "compulsory process for obtaining witnesses in his favor." The Supreme Court of the United States explained, "[t]he right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness' testimony heard by the trier of fact." *Taylor v. Illinois*, 484 U.S. 400, 409 (1988). However, the Court also elaborated that an "accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence. The Compulsory Process Clause provides him with an effective

12

weapon, but it is a weapon that cannot be used irresponsibly." *Id.* at 410. Simonton's Fifth Amendment privilege, if the trial court was correct in its ruling that the privilege was properly asserted, would be one of the exceptions to the compulsory process clause of the Sixth Amendment outlined in *Taylor.* On appeal, this Court reviews if a trial court's decision to preclude a witness from being called to testify due to the invocation of the Fifth Amendment privilege against self-incrimination for an abuse of discretion. *Combs v. Commonwealth,* 74 S.W.3d 738, 745 (Ky. 2002).

In the present case, Cedric Weaver testified at trial that he saw Tramber and McLemore "shooting at the people who was on the porch of the apartments . . . a couple houses down from Ne'Riah Miller's house." He testified he saw McLemore with a gun with an extended magazine (though he had told McLemore's investigator that it was Tramber who had the gun with the extended magazine). Weaver said that he had been "sitting on the porch" of Simonton's (Budda's) aunt's house with "Budda's nephew and Budda." He went on to testify that "Budda . . . was in the house when the shooting . . . occurred."

Simonton, who the lead detective indicated was a person of interest in Lindsay's shooting, told McLemore's investigator that it had been so long, he did not recall where he was on the day of the shooting and that he "kn[e]w of" Weaver, but did not see him that day. When the defense investigator asked Simonton again about being with Weaver on the day in question, Simonton

13

responded "nah. I heard that Cedric was putting my name in some stuff . . . that my name shouldn't be involved in . . . ."

McLemore asserts that, if called to testify, Simonton likely would have impeached Weaver's trial testimony concerning his alleged eyewitness account of the shooting. The lead detective in the case acknowledged that Weaver was the first person who "puts William McLemore" at the scene of the crime. McLemore insists that Simonton's testimony "is likely to have at least partially contradicted the testimony of Cedric Weaver."

This Court dealt with the impact of a witness's assertion of her Fifth Amendment privilege against self-incrimination in *Combs*, 74 S.W.3d 738. In that case, the appellant, Combs, sought testimony from an alibi witness, Williams. During opening statements, Combs counsel argued that Williams would testify that she had been with Combs during one of the alleged drug deals for which Combs was being prosecuted. According to Combs, the two were detained at K-Mart after being caught shoplifting at the time of the first alleged drug buy. Before she was scheduled to testify, the trial court informed Williams of her rights and asked if she wanted to speak with an attorney before testifying. "After consulting with the attorney, the defense and the Commonwealth each questioned Williams, and Williams invoked her Fifth Amendment right against self-incrimination on two (2) occasions during the questioning." *Id.* at 740-41.

Outside the presence of the jury, Williams stated that she knew Combs and that the two of them were shopping at K-Mart on the date in question. She

14

asserted her Fifth Amendment privilege when asked if Combs had stolen any items, but did say that Combs had been detained at K-Mart during their trip. When the Commonwealth asked Williams what her involvement was, she again invoked the privilege. She did, however, respond to the Commonwealth's question regarding whether she had ridden to K-Mart that day with Combs in the affirmative. Because Williams planned to invoke the privilege as to certain questions, the Commonwealth moved the trial court to exclude her testimony. It argued, "it's the Commonwealth's position that if they are going to assert the privilege then they can't testify to anything other than name or date. They can't selectively choose which questions they are going to answer and which questions they are not going to answer." *Id.* at 741. The trial court agreed with the Commonwealth, finding, "simply by taking the stand, this witness would have to waive her Fifth Amendment privileges and we can't piecemeal what she is going to waive and what she is not going to waive." *Id.*

In *Clayton v. Commonwealth*, decided more than two decades before *Combs*, this Court held "[t]he trial judge did not commit reversible error in refusing to allow [an appellant] to call a witness who stated he would exercise his Fifth Amendment right to refuse to answer questions." 786 S.W.2d 866, 868 (Ky. 1990). In *Clayton*, after the witness was called and sworn, the jury was excused. The witness gave his name and address, and then, on the advice of his attorney, invoked his Fifth Amendment privilege. *Id.* Furthermore, in *Commonwealth v. Brown*, two witnesses "indicated that they would refuse to testify on the grounds of their . . . privileges against self-incrimination" at a

15

pretrial hearing. 619 S.W.2d 699, 701 (Ky. 1981), *overruled on other grounds by Murphy v. Commonwealth,* 652 S.W.2d 69 (1983). This Court held that "the court rightly decided that the Commonwealth not be allowed to call them as witnesses because the Commonwealth was aware that they would assert their privileges against self-incrimination." *Id.* at 703.

In *Combs,* we distinguished *Clayton* and *Brown,* as those cases both dealt with instances in which the witness would invoke the privilege as to all testimony. *Combs,* 74 S.W.3d at 742. We recognized that "federal courts have recognized the necessity of accommodating valid assertions of privilege by defense witnesses, and have found the 'drastic remedy' of precluding testimony appropriate only where a witness's invocation of the privilege frustrates cross-examination on issues material to the witness's testimony." *Id.* at 744.

In *Combs,* the trial court had conducted a "dry run" of the questions the defense and Commonwealth planned to ask Williams outside the presence of the jury. We noted, "the purpose of the 'dry run' of Williams's testimony was to preview the questions and responses and to allow the trial court to determine whether it could accommodate Williams's valid assertions of privilege without impairing the Commonwealth's ability to test the truthfulness of the testimony through cross-examination." Importantly, we held:

> we find it improper to simply *assume* that Williams would invoke
> the privilege as to questions she was never asked. While a
> defendant's Sixth Amendment right to compulsory process must
> yield to *legitimate* demands of the adversarial process, a witness
> should not be precluded from testifying based on speculation
> about whether he or she would invoke a privilege.

16

*Id.* at 745.

In *Combs*, we reversed the trial court, as there was "no evidence that the trial court even considered whether it could permit Williams to testify and limit the scope of the Commonwealth's cross-examination without prejudicing the Commonwealth's ability to test the truth of Williams's testimony." *Id.* That is not the case here. In this case, the judge ruled Simonton had asserted his Fifth Amendment privilege through his attorney. The defense sought to ask Simonton whether he was "on the porch on 37th Street that day" and whether he was "with Mr. Weaver." The Commonwealth indicated that, on cross, it wanted to ask Simonton questions about where he had been earlier in the day, if he knew any information about Lindsay's shooting (just hours before Ne'Riah Miller was shot and killed) or had been involved in it, and if he had been moving items in and out of vehicles earlier in the day. The following exchange then occurred:

| | |
|---|---|
| Commonwealth: | Um, so there certainly has been the implication that [Simonton] may have been part of something else, and so if he's being offered for this, sort of this limited purpose . . . and they . . . have heard his name, then my intention would be to question him about what he knows or his possible involvement. |
| . . . . | |
| Judge: | The answer no, I didn't shoot anybody. No, I wasn't there. Um, you know, those are things that wouldn't incriminate him, but I don't know what the answers are . . . |

17

| | |
|---|---|
| Commonwealth: | I, I have told him the context of the witness that I, that I believe that those would be the questions that are fair game to ask him if he were on the stand. |
| Judge: | [Simonton's counsel], do you think, . . . if the Commonwealth were to call your client and ask those questions, are those questions that you would . . . advise him to assert his Fifth Amendment right? |
| Simonton's Counsel: | Your honor, based upon everything I've been told from various sources, I have great concern about my client becoming a witness. . . . |
| . . . . | |
| Simonton's Counsel: | All I know is that what I've been told by the prosecution is that . . . he's suspected of being highly involved in whatever this is all about and it causes me great concern. |

McLemore argues that, while Simonton's counsel's advice was that his client assert his Fifth Amendment privilege concerning testimony in this case, the parties did not conduct a "dry run" of the questions in order to determine, in line with *Combs*, whether Simonton's privilege could be asserted as to some issues without impairing "the Commonwealth's ability to test the truthfulness of the testimony through cross-examination." *Combs*, 74 S.W.3d at 745. While the parties did not go through a question-by-question "dry run" with Simonton, they did describe their proposed questions before Simonton's attorney asserted his privilege. Furthermore, it appears that issue in *Combs* is not the deciding point in this case. Simonton sought, through counsel, to assert his privilege concerning *all* testimony—making this case fall more in line with *Clayton* and

18

*Brown* in which the witnesses claimed the privilege as to all questions. As previously discussed, in those cases, we held it was not erroneous for the trial courts to disallow the witnesses being called.

This case differs slightly from even *Clayton* and *Brown*. In those cases (along with *Combs*), the witnesses were personally asked questions outside the presence of the jury to which they asserted their Fifth Amendment privilege against self-incrimination. In this case, Simonton did not personally take the stand and assert the privilege. However, after the description of the questions, the trial court found that Simonton, through counsel, asserted his privilege against self-incrimination as to all questions concerning the day of the shootings.

We dealt with a similar situation in *Lemon v. Commonwealth*, No. 2006-SC-000636-MR, 2007 WL 4462365, at *3 (Ky. Dec. 20, 2007). There, we held that an attorney's invocation of his clients' Fifth Amendment rights was adequate and that the trial court did not merely "speculate[] that the [witnesses] would invoke their rights." *Id.* In *Lemon*, the desired witnesses "were convicted of offenses that arose during the same events upon which Lemon would seek to question them, not some unrelated collateral offenses." *Id.* We went on to hold "[n]or do we find it necessary for the [witnesses] to be present in court to invoke privilege. The [witnesses], through their attorneys, made it clear they would invoke their right against self-incrimination in regards to questions relating to the events surrounding their offenses." *Id.*

19

The same is true in the present case. Outside the presence of the jury, the Commonwealth made it clear that it planned to cross-examine Simonton concerning his involvement in the Lindsay shooting. The Commonwealth had presented testimony regarding that shooting and the direct link between the Lindsay shooting and the shooting that led to sixteen-month-old Ne'Riah Miller's death. Just as in *Lemon*, Simonton, "through [his] attorney[], made it clear [he] would invoke [his] right against self-incrimination in regards to questions relating to the events surrounding" the shooting. *Id.* It is important to note that the lead detective on the case had indicated that, within twenty-four hours of the shootings, police had been looking for Simonton, as a "person of interest." For Simonton to answer any of the questions proposed by either side, it would potentially place him at the scene of one or both shootings.

As Courts of this Commonwealth have long recognized:

> Should it appear to the court that in the setting in which the question was asked there is reasonable possibility of exposure to prosecution or involvement in a crime by reason of a responsive answer, the claim of privilege must prevail. But the danger of self-incrimination to be apprehended must be real and substantial in the ordinary course of things, for the law does not permit a witness arbitrarily to hide behind an imaginary or unappreciable danger or risk. Otherwise, it would be within the power of a witness by a colorable pretense of self-incrimination, or by a subterfuge, to avoid giving culpable information concerning other persons.

*Young v. Knight*, 329 S.W.2d 195, 201 (Ky. 1959). Here, the trial court did not merely allow Simonton to "hide behind an imaginary or unappreciable danger or risk." *Id.* Rather, he was suspected of being involved in Lindsay's shooting earlier that same day. Both McLemore's and the Commonwealth's proffered questions (which concerned where he was on the day of the two shootings, who

20

he was with, and, more directly, whether he was involved in Lindsay's shooting) could have implicated Simonton in a crime.

For these reasons, we hold the trial court did not abuse its discretion in ruling that McLemore could not call Simonton as an impeachment witness.

## C. Speedy Trial

Finally, McLemore argues he was denied his constitutional right to a speedy trial. The Sixth Amendment to the United States Constitution guarantees criminal defendants "the right to a speedy and public trial." "This guarantee applies to the states through the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." *Smith v. Commonwealth*, 361 S.W.3d 908, 914 (Ky. 2012) (citing *Barker v. Wingo*, 407 U.S. 514, 515 (1972); *Klopfer v. North Carolina*, 386 U.S. 213, 222-23 (1967)). The right to a "speedy public trial" is also guaranteed by the Kentucky Constitution. Ky. Const. § 11.

To determine whether an appellant's speedy trial rights were violated, we balance four factors: (1) the length of the delay, (2) the reasons for the delay, (3) the appellant's assertion of his rights, and (4) the prejudice to the appellant. *Barker*, 407 U.S. at 530-32. "We regard none of the four factors . . . as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Id.* at 533.

## 1. Length of Delay

Under the *Barker* analysis, we begin by asking whether the length of the delay was presumptively prejudicial: "[t]he length of delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors . . . ." *Id.* at 530. However, no precise amount of time is presumptively prejudicial, as the length of delay must be considered within the particular context of each case. *McDonald v. Commonwealth*, 569 S.W.2d 134, 136 (Ky. 1978).

The length of delay is measured as "the time between the earlier of the arrest or the indictment and the time trial begins." *Dunaway v. Commonwealth*, 60 S.W.3d 563, 569 (Ky. 2001) (citing *Dillingham v. United States*, 423 U.S. 64 (1975)). Here, McLemore was indicted and arrested on the same day: September 11, 2014. His trial date was February 21, 2017—more than 29 months after his initial indictment and arrest.

Each delay must be considered within its own context. *Barker*, 407 U.S. at 522. A delay that can be tolerated for an ordinary street crime is considerably less than for a more serious charge. *Id.* at 531. Nonetheless, this Court has previously held that eighteen months constituted presumptive prejudice in a complex murder case. *Bratcher v. Commonwealth*, 151 S.W.3d 332, 344 (Ky. 2004). As the Commonwealth concedes, we hold that a twenty-nine-month delay amounts to presumptive prejudice here. However, a finding of presumptive prejudice does not establish actual prejudice; rather, it serves to establish that the delay was long enough to trigger further inquiry into the

22

remaining three *Barker* factors, to which we now turn. *Doggett v. United States*, 505 U.S. 647 (1992).

## 2. Reasons for the Delay

The second prong of the *Barker* analysis seeks to weigh the reasons for the delay. "Different weights should be assigned to different reasons." *Barker*, 407 U.S. at 531. For example, deliberate delays by the government in order to hamper the defense should be weighed more heavily against the government than neutral reasons for delay such as overcrowded courts. *Id.* Moreover, "a valid reason for delay, such as a missing witness, should serve to justify appropriate delay." *Id.* Essentially, "[t]he purpose of our analysis is to establish 'whether the government or the criminal defendant is more to blame for the delay.'" *Stacy v. Commonwealth*, 396 S.W.3d 787, 796-98 (Ky. 2013) (citing *Doggett*, 505 U.S. at 651). McLemore argues that in this case the Commonwealth is solely to blame for the delay in bringing him to trial. The Commonwealth asserts that the reasons for the delays were either shared collectively amongst the parties or were neutral.

McLemore asserts that there was an initial delay of thirteen months between his indictment and the time his case was set for trial. He contends this delay was attributable to the pace at which the Commonwealth conducted its discovery. After McLemore's initial indictment in September 2014, the Grand Jury issued a superseding indictment in May 2015. The new indictment included additional co-defendants. In June 2015, McLemore's counsel indicated at a bond hearing that discovery was not complete—and agreed with

23

Tramber's counsel that the delay was caused by the Commonwealth. In July 2015, McLemore's counsel indicated he was waiting on additional discovery in order to decide whether to move for a separate trial due to some indication during the Grand Jury testimony that Dunn, one of the co-defendants, had implicated McLemore. There is no evidence that the Commonwealth was purposefully delaying its investigation and production of discovery in this case. It was not a deliberate attempt to delay trial that should be weighted heavily against the prosecution as discussed in *Barker*, 407 U.S. at 531. This was a complex matter involving multiple co-defendants (even more than originally indicted—as evidenced by the superseding indictment). We hold this delay for discovery in a complex murder case with many different co-defendants and witnesses was valid and justifiable under *Barker*. *Id.*; *see also Smith*, 361 S.W.3d at 915. This delay in discovery was little more than half as long as the two-year delay *Dickerson v. Commonwealth*, 278 S.W.3d 145, 151 (Ky. 2009), which we held weighed only slightly in the appellant's favor.

Next, McLemore asserts that a delay in the trial in order for the Commonwealth to redact statements in order for the defendants to be tried together added to the violation of his right to a speedy trial. On April 19, 2016, the trial court denied Dunn's motion to suppress his statement. A week later, the Commonwealth sought to sever Dunn's trial from McLemore, Duwan Mason, and Tramber's joint trial. The Commonwealth intended to proceed with Dunn's trial at the June trial date set and to try the remaining defendants at a future date. McLemore then filed a motion for a speedy trial. Dunn retracted

24

his request for a separate trial and moved to be tried jointly with his co-defendants. However, McLemore opposed this request and asked that "the court adopt the way the Commonwealth has elected to go forward on this case."

On appeal, McLemore argues he "is not responsible for the divide and conquer strategy that the Commonwealth employed in this case and that caused his trial to be re-scheduled." However, this is the very relief that McLemore asked the court for when Dunn attempted to have his case rejoined with his co-defendants'. In retrospect, McLemore asserts that the Commonwealth's strategy led to Dunn entering a guilty plea and agreeing to testify against his co-defendants. However, this turn of events has nothing to do with delaying McLemore's case—only its ultimate outcome. Furthermore, we have held, "[i]f a defendant acquiesces in a delay, he cannot be heard to complain about the delay." *Gabow v. Commonwealth*, 34 S.W.3d 63, 70 (Ky. 2000) *overruled on other grounds by Crawford v. Washington*, 541 U.S. 36, 60–61 (2004). Here, McLemore not only acquiesced to the delay, he asked the trial court to proceed in the manner that led to the delay. This delay is attributable to both parties.

Next, McLemore complains that the length of time he and his co-defendants had to wait for their new trial was another delay partially attributable to the Commonwealth. When the trial court proposed dates for the trial, McLemore agreed to all dates, but the Commonwealth, for various reasons, did not. Some of these reasons involved missing witnesses, and were, thus, valid. *Barker*, 407 U.S. at 531. However, the others were scheduling

25

issues. As the Supreme Court held in Barker, "[a] more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." Therefore, the delay between the original June court date and the rescheduled date in October is weighed slightly against the Commonwealth.

Finally, McLemore complains of a continuance granted which moved his October trial date. However, this continuance was sought by Tramber, one of his co-defendants—not by the Commonwealth. Mason, McLemore's other co-defendant joined the motion, which the Commonwealth did not oppose. In a similar case, *Bratcher*, 151 S.W.3d at 344, we held: "the delay was caused by Appellant's co-defendant on whose motion the continuance was granted. As such, this factor weighs against neither the Commonwealth nor Appellant." McLemore attempts to distinguish *Bratcher*, as the Commonwealth opposed the motion for a continuance in that case and did not do so here. However, we will not penalize the Commonwealth for merely agreeing that a continuance was appropriate when one of the co-defendants got a new lawyer shortly before the upcoming trial date. The Commonwealth still did not seek the continuance and we will not weigh it against the government.

Of the delays, only the "neutral reasons" weigh against the Commonwealth—and those only slightly.

26

### 3. *Appellants' Assertion of Their Rights*

The third *Barker* factor is the defendant's assertion of his right to a speedy trial. Here, McLemore undeniably asserted the right to a speedy trial numerous times. However, this Court has previously found that where a defendant agreed to an order delaying his trial by as little as one month, it "cast[ed] doubt on the sincerity of his demand for a speedy trial." *Stacy*, 396 S.W.3d at 798 (citing *United States v. Brown*, 169 F.3d 344, 350 (6th Cir. 1999)).

In *Stacy*, the total delay before trial was twenty months. *Id* at 796. The defendant in that case asserted his right to a speedy trial with both oral objections and written motions to the trial court. *Id.* at 798. However, this Court held that as a result of the defendant agreeing to an order that moved his trial date back by just one month, we would recognize "that he did in fact assert his right to a speedy trial, [but that] he did not vigorously do so. As a result, we cannot say that this [third *Barker*] factor weighs in Appellant's favor." *Id.*

As previously noted, McLemore in this case asked the trial court to follow the Commonwealth's plan to try Dunn first (at a trial date for which his case was previously scheduled) and to try him and his remaining co-defendants at a later date—with no new trial date set in the order. Thus, although McLemore did assert his right to a speedy trial, he did not vigorously do so. Consequently, as in *Stacy*, this factor does not weigh in McLemore's favor.

27

### 4. *Prejudice to the Defendant*

The last factor in the *Barker* analysis asks whether the appellant was actually prejudiced by the delay. The United States Supreme Court has identified three relevant interests that the Sixth Amendment's speedy trial right was designed to protect: (1) the prevention of oppressive pretrial incarceration, (2) the minimization of the anxiety and concern of the accused, and (3) the possibility that the defense will be impaired. *Barker*, 407 U.S. at 543. Of these, the last is the most serious. *Id.*

McLemore claims that "there is reason to believe [he] was exposed to both 'oppressive pretrial incarceration' as well as to 'anxiety and concern' while he waited for trial." *Id.* McLemore points out that he had just turned 19 years old and still lived with his mother at the time of the shooting. He insists the trial court should have reduced his bond. However, he makes no actual showing of how he was concretely prejudiced by his incarceration.

Regarding the first interest, *Barker* explains the potential disadvantages for the accused who cannot obtain his release: "[t]he time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness." *Barker*, 407 U.S. at 532. Furthermore, an accused "is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense." *Id.* at 533.

We have consistently held that "[t]he possibility of prejudice alone is not sufficient to support the position that speedy trial rights have been violated. It is the burden of the defendant to establish actual prejudice." *Miller v.*

*Commonwealth*, 283 S.W.3d 690, 703 (Ky. 2009) (citing *Preston v. Commonwealth*, 898 S.W.2d 504, 507 (Ky. App. 1995)); *see also Bratcher*, 151 S.W.3d at 345 ("[a] long delay, while creating 'presumptive prejudice' sufficient to continue the *Barker* analysis, does not necessarily create real prejudice to a defendant."). McLemore makes no specific claims in this regard.

With respect to the second interest—the minimization of anxiety and concern—McLemore only generally points to his age and the fact that he lived with his mother at the time of the shooting. McLemore offers no specific evidence of him actually suffering any unusual amount of anxiety and concern during their incarceration.

Generic assumptions are not enough to show prejudice: "[c]omplaining in general terms about suffering anxiety is insufficient to state a cognizable claim." *Smith*, 361 S.W.3d at 918 (internal citations omitted). There must be "an affirmative showing of unusual anxiety which extends beyond that which is inevitable in a criminal case." *Id.* Here, we do not find that there is any evidence that McLemore suffered an unusual amount of anxiety or concern beyond the inevitable. Simply stating his age is not sufficient to show prejudice in connection with this second interest.

The third and most important interest bearing on prejudice is the possibility of an impaired defense. McLemore does not claim an inability to prepare for his case. Rather, he claims he was prejudiced "by the Commonwealth strategically improving its case against him at the expense of his Sixth Amendment right to a speedy trial." McLemore bases his contention

29

on the Commonwealth's decision to sever Dunn's case and try it first. However, we note again that McLemore *asked* the trial court to do so. He may not now complain of the trial court's ruling. Furthermore, his contention is speculative—relying on what may or may not have transpired if the Commonwealth had pursued the trials in a different order.

Once again, "speculative or generic claims are insufficient to support a claim of prejudice." *Miller*, 283 S.W.3d at 702; *see also Bratcher*, 151 S.W.3d at 345 ("Conclusory claims about the trauma of incarceration, without proof of such trauma, and the *possibility* of an impaired defense are not sufficient to show prejudice."). In other words, McLemore must demonstrate *actual* prejudice that impaired his defense. *Smith*, 361 S.W.3d at 919.

In sum, although McLemore's pretrial incarceration time is presumptively prejudicial, he fails to show real prejudice as a result of it. *Bratcher*, 151 S.W.3d at 345. Thus, this factor does not weigh in favor of McLemore.

## 5. *Balancing the Four* Barker *Factors*

Having considered each *Barker* factor individually, we must now weigh them together. First, it is clear the twenty-nine-month delay is extraordinary and amounted to presumptive prejudice sufficient to trigger a *Barker* inquiry. However, at most, only a minimal amount of the delay can be "blamed" solely on the Commonwealth. Furthermore, although McLemore asserted his right to a speedy trial, his compliance in agreeing to an order that resulted in his trial

date being rescheduled for an unassigned future date casts serious doubt on his desire for a speedy trial. *Stacy*, 396 S.W.3d at 798.

Finally, no serious prejudice was shown as a result of McLemore's pretrial incarceration, as his claims of prejudice were general and speculative. Thus, we conclude our *Barker* analysis by finding that McLemore was not deprived of his right to a speedy trial.

### III. CONCLUSION

For the foregoing reasons, we affirm McLemore's convictions and corresponding sentences.

Minton, C.J.; Hughes, Keller, Lambert, VanMeter, and Wright, JJ., concur. Nickell, J. not sitting.

COUNSEL FOR APPELLANT WILLIAM MCLEMORE:

Daniel T. Goyette
Louisville Metro Public Defender's Office

Joshua Michael Reho
Louisville Metro Public Defender's Office

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Gregory C. Fuchs
Assistant Attorney General